J-A11039-15

2015 PA Super 208

| SEARS, ROEBUCK & CO. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| 69TH STREET RETAIL MALL, L.P., 69TH STREET RETAIL OWNER, L.P., 69TH STREET GP, LLC, 69TH STREET GP II, LLC, AAC MANAGEMENT CORP., AND ASHKENAZY ACQUISITION CORP. | |
| Appellants | No. 2359 EDA 2014 |

Appeal from the Judgment Entered on July 23, 2014
In the Court of Common Pleas of Delaware County
Civil Division at No.: 12-50500

| SEARS, ROEBUCK & CO. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellant | |
| v. | |
| 69TH STREET RETAIL MALL, L.P., 69TH STREET RETAIL OWNER, L.P., 69TH STREET GP, LLC, 69TH STREET GP II, LLC, AAC MANAGEMENT CORP., AND ASHKENAZY ACQUISITION CORP. | |
| Appellees | No. 2506 EDA 2014 |

Appeal from the Judgment Entered on July 23, 2014
In the Court of Common Pleas of Delaware County
Civil Division at No.: 12-50500

BEFORE: FORD ELLIOTT, P.J.E., OLSON, J., and WECHT, J.

OPINION BY WECHT, J.:                              **FILED OCTOBER 02, 2015**

In this case, Sears, appellee and cross-appellant before this Court, sued the above-captioned appellants, who are also the cross-appellees in this matter, alleging, *inter alia*, that the appellants had constructively evicted Sears from a building that Appellant entities variously owned, marketed, and maintained. Sears' claim was based upon a years-long history of Appellants' alleged failure to maintain the interior and exterior of the building occupied by Sears, as well as the parking garage that serviced the building, in violation of Appellants' obligations under the parties' lease agreement ("the Lease"). Sears alleged that these necessitated Sears' extensive and ongoing self-help and adversely impacted their business to such an extent that it effectively forced them to abandon the property. The jury found in Sears' favor, entitling Sears to withhold all rent obligations remaining on the Lease at the time of their abandonment. As well, the jury awarded Sears damages for intentional interference with contractual relations.

Appellants, which all are related to each other and were formed to administer the property at issue ("the Premises"), appeal the trial court's refusal to enter judgment in their favor notwithstanding the jury's verdict (hereinafter "JNOV"). They maintain that Sears failed to present evidence sufficient to satisfy the stringent standard governing claims for constructive eviction. They also dispute the jury's award of damages for intentional interference with contractual relations. In its cross-appeal, Sears argues that the trial court erred in denying it the opportunity to submit its punitive damage claim to the jury. After careful review, we must vacate the

judgment. However, we do so for only one narrow purpose—to allow Sears the opportunity to try its claim for punitive damages, which we find that the trial court improperly declined to submit to the jury. In so doing, we deny all of Appellants' issues on appeal.

Before we may address the factual underpinnings of, or the issues raised in, this case, it is necessary to review the parties and their complex interrelationships. Sears is simply the tenant in this matter; the complications arise thanks to the intertwined corporate entities named as defendants in this litigation, whose relationships must be understood to grasp the arguments presented in this case.

- Monarch, Inc. ("Monarch"), was the original lessee with Sears. Monarch's entire interest in the Premises later was acquired by the entities with "69th Street" in their names.

- 69th Street Retail Mall, L.P.; 69th Street Retail Owner, L.P.; 69th Street GP, LLC; and 69th Street GP II, LLC, who collectively purchased the relevant assets from Monarch and served as assignees of the Lease. These entities are collectively identified throughout this Opinion as the "Landlord."

- Ashkenazy Acquisition Corp. (hereinafter, "Ashkenazy"[1]) served as the Landlord's leasing and development agent.

- AAC Management Corp. was the property manager (hereinafter, "AAC"). AAC eventually was dismissed as a party from this litigation.

---

[1] Confusingly, Appellants identify Ashkenazy as "AAC," despite the trial court's use of "Ashkenazy" and the presence of AAC Management Corp., a separate entity, as a party to this litigation. We adhere to the trial court's convention.

- 3 -

When possible, we refer to these parties collectively as Appellants as a mere convenience, recognizing that not in all instances are all captioned Appellants actually involved in the question under examination. However, in certain instances we must refer to the non-Landlord parties individually, and we do so according to the above conventions.

The trial court has provided the following account of the factual and procedural history of this case:

> [O]n May 28, 2013, [Sears] filed an Amended Complaint which contained the following three (3) counts requesting relief: 1) breach of the [L]ease/covenant of quiet enjoyment by [the Landlord] (Count I); 2) constructive eviction of Sears by [the Landlord] (Count II); and 3) intentional interference with the [L]ease contract between Sears and [the Landlord] by AAC (later removed as a party) and Ashkenazy (Count III). Sears sought compensatory and punitive damages for the alleged intentional interference. . . .[2] [The Landlord] and Ashkenazy . . ., by Counterclaim for breach of contract, sought to have Sears pay the accelerated balance of all rent due through August 16, 2018.
>
> Trial was conducted on March 17, 2014 through March 25, 2014.
>
> * * * *
>
> Sears averred, in its Amended Complaint, that, pursuant to [the Lease,] dated April 19, 1988, [Sears] commenced operating a department store at the [P]remises . . . . On August 2, 2007, Sears invoked its right to extend [the L]ease for an additional ten (10)[-]year period until August 16, 2018 pursuant to the [Lease's] terms. Sears was to initially conduct business on the first two (2) floors of the building, an area consisting of approximately [133,373] square feet with options to occupy additional spaces. The [Premises] also included common areas

---

[2] As set forth at greater length, *infra*, the prescribed remedy for Counts I and II is abatement of Sears' rent obligations under the lease.

that contained a [four-level] parking deck and [a] surface parking lot. . . .

An entity known as Monarch Inc. was the original landlord. On or about June 23, 2005, Monarch assigned its contractual rights under the [L]ease to [the Landlord]. Sears alleged . . . that after it declined a February 2006 offer from [the Landlord] to consider a buyout of the [L]ease, that the maintenance and attention to the property was insufficient to maintain the building as provided for in the [Lease]. Sears alleged [L]andlord default in deficient lighting and electric systems in the parking deck, deteriorated structural aspects of the parking deck, water and sewer leaks, sewage backup inside the department store, deterioration of the store façade, and failure to maintain, clean and landscape the [Premises] pursuant to the [Lease].

Sears issued a series of notices of default to the [L]andlord commencing on May 1, 2009 to provide notice of intent to perform self-help remedies pursuant to the [Lease]. Sears was told by [AAC] not to self-remedy and told by [the L]andlord's lawyers that they would be in default if they resorted to self-help. Sears averred that during the ensuing three (3) years, repeated commitments to make repairs were never fulfilled by [the Landlord]. Sears claimed that Ashkenazy, through AAC, its property managers, and its own leasing agents, desired to force Sears out of the [Premises] due to their attempt to secure other tenants for the space and their failed attempts to buy Sears out of the balance of the [Lease]. [The Landlord] countered that the alleged conditions in the parking areas and store did not prevent or deprive Sears of operating its business on a day to day basis up through May of 2012. [The Landlord] countered that Sears is obligated to pay the balance of the [Lease] and that the closing of the Sears store . . . was due to the nationwide economic downturn of the Sears Corporation. Specifically, Sears announced in December of 2011 its closing of approximately one hundred fifty-seven (157) stores nationwide, which included the [P]remises.

At the close of [Sears' case, AAC] was removed as a party by stipulation. After the close of the record evidence, [the trial court] granted [Appellants'] Motion for a Directed Verdict as to punitive damages. . . .

The jury found that [the Landlord] breached the [Lease] by constructively evicting Sears[,] thereby suspending Sear[s']

- 5 -

obligation to pay rent. The jury further found that Ashkenazy . . . was not an agent of [the Landlord] acting within the scope of its authority and that Ashkenazy intentionally interfered with the [Lease] between [Landlord] and Sears. The jury awarded $66,119.30 as compensatory damages as a result of the intentional interference with contractual relations.

Trial Court Opinion ("T.C.O."), 11/13/2014, at 2-7 (record citations omitted).

Appellants raise the following issues on appeal:

1. When the [Lease] explicitly obligated [Sears] to continue to pay rent even if the Landlord breached its repair and maintenance duties under the Lease, did the trial court err by failing to enter judgment as a matter of law in favor of the Landlord on its counterclaim for unpaid rent and on [Sears'] constructive eviction claim when [Sears] failed to introduce any evidence of substantial interference by the Landlord with [Sears'] possession of the Premises, and [Sears] at all times used the Premises as a full-line Sears department store as the Lease contemplated?

2. Did the trial court err by failing to enter judgment as a matter of law in favor of [Ashkenazy] on [Sears'] claim for tortious interference with contract (*i.e.*, the Lease) when the undisputed evidence showed that the Landlord was a single-purpose corporate entity that had no employees and acted solely through its leasing and management agents[, respectively Ashkenazy and AAC,], and [Sears] did not introduce any evidence to prove that [Ashkenazy] acted outside the scope of its agency?

3. Did the trial court err by failing to grant the Landlord's motion for a new trial on [Sears'] constructive eviction claim and the Landlord's counterclaim for unpaid rent, when: (a) the [c]ourt incorrectly instructed the jury that it could find a constructive eviction based on nothing more than a substantial decrease in the "utility" of the Premises; and (b) the jury's verdict was against the overwhelming weight of the evidence?

Brief for Appellants at 3-4. In its cross-appeal, Sears raises the following issue: "Whether the trial court erred when it refused to instruct the jury on

- 6 -

Sears' claim for punitive damages against [Ashkenazy] because of its tortious interference?" Brief for Sears at 5.

We begin our review with Appellants' first issue, but then skip to its third issue, insofar as the jury instruction question is informed by and informs our discussion of Appellants' first asserted basis for JNOV. We then turn to Appellants' second issue, which would only require relief as to one aspect of the judgment subject to this appeal. Finding ultimately that Appellants are not entitled to relief on any of their issues, we conclude by addressing Sears' argument concerning punitive damages, which we find requires relief.

Appellants' first and second issues in the order in which they are presented both assert bases upon which Appellants believe that the trial court should have granted JNOV. Our standard of review of a trial court's order declining to grant JNOV is as follows:

> Appellate review of a denial of JNOV is quite narrow. We may reverse only in the event the trial court abused its discretion or committed an error of law that controlled the outcome of the case. **Hutchinson v. Penske Truck Leasing Co.,** 876 A.2d 978, 984 (Pa. Super. 2005). "Abuse of discretion occurs if the trial court renders a judgment that is manifestly unreasonable, arbitrary or capricious; that fails to apply the law; or that is motivated by partiality, prejudice, bias or [ill will]." **Id.**

> When reviewing an appeal from the denial of a request for [JNOV], the appellate court must view the evidence in the light most favorable to the verdict[-]winner and give him or her the benefit of every reasonable inference arising therefrom while rejecting all unfavorable testimony and inferences. . . . Thus, the grant of [JNOV] should only be entered in a clear case and any doubts must be resolved in favor of the verdict[-]winner. . . .

> ***Hutchison ex rel. Hutchison v. Luddy,*** 896 A.2d 1260, 1265 (Pa. Super. 2006) (citations and quotation marks omitted).

***Thomas Jefferson Univ. v. Wapner***, 903 A.2d 565, 569 (Pa. Super. 2006) (citations modified).

> It is axiomatic that[] there are two bases upon which [JNOV] can be entered:  one, the movant is entitled to judgment as a matter of law, and/or two, the evidence was such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant.  To uphold JNOV on the first basis, we must review the record and conclude that even with all the factual inferences decided adverse[ly] to the movant the law nonetheless requires a verdict in his favor, whereas with the second we review the evidentiary record and conclude that the evidence was such that a verdict for the movant was beyond peradventure.

***Rohm & Hass Co. v. Continental Cas. Co.***, 781 A.2d 1172, 1176 (Pa. 2001).  In connection with the latter, evidence-based grounds for JNOV, relief will only be granted "when the jury's verdict is so contrary to the evidence as to shock one's sense of justice."  ***Samuel-Bassett v. Kia Motors Am.***, 34 A.3d 1, 39 (Pa. 2011).

Appellants' first argument in favor of JNOV hinges upon the legal standard for constructive eviction and the adequacy of the evidence to satisfy the elements thereof.  This Court has made the following observations regarding the standard governing a claim of constructive eviction:

> If the tenant is entitled to the beneficial enjoyment of the premises under the terms of his lease, and if he is deprived of this by the act of the landlord[,] it amounts to an eviction, and will suspend the rent. . . .

- 8 -

***Weighley v. Muller***, 51 Pa. Super. 125, 131 (1912).

> The legal implication of the covenant [for quiet enjoyment], express or implied, is that the lessor will permit the tenant to enjoy fully the demised premises subject to any rights of the lessor . . . .  'The covenant . . . is breached when a tenant's possession is impaired by the acts of the lessor or those acting under him . . . .'  The impairment of the lessee's possession need not be total, but the utility of the premises must be *substantially* decreased by the landlord's interference with a right or privilege which is necessary to the enjoyment of the premises . . . .

***Checker Oil Co. of Del., Inc., v. Harold H. Hogg, Inc.***, 380 A.2d 815, 818-19 (Pa. Super. 1977). . . .

> Recovery for breach of this covenant . . . has been allowed in Pennsylvania where a landlord has evicted the tenant by locking up the leased premises and denying the tenant access . . ., and where the landlord so *substantially* altered some essential feature of the premises as to render the property unsuitable for the purpose for which it was leased.

***Pollock v. Morelli***, 369 A.2d 458, 460 (Pa. Super. 1976) (emphasis added).

***Jonnet Dev. Corp. v. Dietrich Inds., Inc.***, 463 A.2d 1026, 1033

(Pa. Super. 1983) (citations modified).

> "To constitute a constructive eviction, the interference by a landlord with the possession of his tenant or with the tenant's enjoyment of the demised premises must be **of a substantial nature and so injurious to the tenant as to deprive him of the beneficial enjoyment of a part or the whole of the demised premises**, . . . to which the tenant yields, abandoning the possession within a reasonable time."  But, "[h]owever much the tenant may be disturbed in the beneficial enjoyment of the premises by the landlord's wrongful act, there is no constructive eviction if he continues in possession of the whole of the premises.  Possession must be given up by the tenant in consequence of the landlord's acts . . . ."  49 Am.Jur.2d §§ 302, 303; *see also Chelten Ave. Bldg. Corp. v. Mayer*, 172 A. 675,

677 (Pa. 1934) ("In order that a tenant may rely on constructive eviction . . . he must abandon the premises. . . ."); *id.* (collecting cases).

*Kuriger v. Cramer*, 498 A.2d 1331, 1338 (Pa. Super. 1985) (emphasis added; citations modified; footnote omitted).

Appellants' first argument in support of JNOV hinges upon the sufficiency of the evidence to establish the level of substantiality and injuriousness necessary to enable a jury to find that a constructive eviction occurred. Its second argument, in seeking relief based upon the terms of the Lease, seeks to establish that Appellants are entitled to judgment as a matter of law.

We begin with the trial court's account of the evidence presented at trial that bore upon constructive eviction, mindful that our standard of review requires us to view the evidence in the light most favorable to Sears as the verdict-winner:

> Joseph Monahan, who worked for Sears as its district sales manager and whose responsibility included the store in question, testified about the major maintenance issues and repairs that went unremedied despite repeated requests. He stated that the parking garage had concrete falling out of the ceiling and that seventy percent (70%) of the lights in the garage were burnt out at one point. He was "afraid to get out of [his] car" due to the chance of falling debris. He noted cracks in the side of the building that caused rain water to enter the store, flooding the interior and causing "anywhere from an inch to two (2) inches of water on the floor throughout the whole first floor" when it rained hard. Mr. Monahan recalled having to replace sheet rock on one whole side of the building and the carpet on the first floor more than ten times during a two (2)[-]year period. He also testified that these problems were reported to his superiors, Ms. Cheryl Schwartz and Mr. [Joseph] Kaminski (who also

- 10 -

testified about these same issues)[,] and that he reported the issues to the local [L]andlord representative.[3] He spoke to the [L]andlord representative at least thirty (30) times during the two (2) years that he managed the [Premises]. He testified that the [L]andlord would fix twenty percent (20%) of the broken lights and leave the other eighty percent (80%) unfixed. He detailed serious drainage problems in the garage that led to deteriorating concrete that was falling out of the ceiling in the garage, neglected landscaping, snow accumulation, leaks in the ladies['] room and break room, sewage overflow of human waste from the upstairs tenant, an ugly and unkempt building exterior, and an unsafe environment.

The testimony of Patrick Sweeney, the district facilities manager for Sears, and former store manager in training at the [Premises,] corroborated the testimony of Mr. Monahan, highlighting what he described as the "horrific" condition of the outside of the Sears building. He noted the falling bricks from the façade (one striking a customer who came into the store with a bleeding head), the numerous cracks, leaks in the interior (having to tarp the products), slipping hazards, the neglected landscaping, the water cascading down the building and staining the building where the gutters had rusted away, concrete chunks falling from the garage ceiling (striking vehicles) and a rat infestation problem. He testified about the darkness of the garage and how Sears had to pay out of its pocket to add some lighting to the garage because there were homeless people living in the garage and illicit activity, including drug sales and prostitution in the parking garage. He testified that conditions were brought to the attention of the local property managers. He described the unsuccessful temporary patch[-]type fixes that were occasionally provided by the [L]andlord, but were never

---

[3] This reference likely pertains to either Nick Veros (who is identified in the trial transcript as Mr. Vros but by Appellants as Mr. Veros) or Andrew LoFredo. Mr. Veros identified himself as a director of property management for the "Ashkenazy organization" from 2004 until 2014. *See* Notes of Testimony ("N.T."), 3/19/2014 vol. I, at 143-44. He indicated as well that he worked "through" AAC. *Id.* at 145. Mr. LoFredo joined Ashkenazy in 2010 as the director of property management, but it is less clear from his testimony whether he worked directly for Ashkenazy or for the "Ashkenazy organization" in the guise of AAC. *See* N.T., 3/18/2014 vol. II, at 7-8.

close to adequate. He noted that the ongoing issues were repeated[ly] raised to [t]he "[L]andlord representative[,"] but never properly remedied.

Christine Shearburn testified that she worked at the Upper Darby Sears for thirty-two (32) years in various capacities and was the operation manager in the store from 1998 to 2010. She was responsible for the physical appearance of the store and, among other things, loss prevention. She corroborated Mr. Sweeney and Mr. Monahan's testimony regarding the condition of the [Premises]. She testified to the negative impact that the exterior . . . had on the [Premises] and the customer's impression. Some customers were afraid to return to their cars in the parking garage after dark.

Numerous photographs were admitted during the trial [to support, *inter alia*,] the testimony of [Mr.] Kaminski, the regional vice president for Sears during the time in question, who noted the terrible condition of the [Premises] as he observed and went through a number of photographs depicting the condition of the [Premises]. Specifically, Mr. Kaminski outlined letters and emails that noted deficiencies at the [Premises] and in April 2009 he described photos of the [Premises] and what he saw. He was "blown away" [by] the severity of the condition of the [Premises]. . . . He noted the deficiencies to Cheryl Schwartz, the real estate manager for Sears, and sent photographs depicting the problems to her. . . . He testified that, during the three (3) years he had responsibility for the Upper Darby Sears Store, the [L]andlord never did anything to make the problems he noted noticeably better.

Kirk Harman, a structural engineer, testified for [Sears] that the parking garage was structurally unsound and not fit for use for its intended purpose. He noted the multiple code violations of Upper Darby Township['s building code] and he testified that the parking garage was in a state of substantial disrepair due to long[-]term neglect . . . .

[Ms.] Schwartz, the real estate manager for Sears Holdings Corporation, stated that if, after a certain period of time, the facility manager or store and district representatives cannot get a result on maintenance and repairs[,] they are brought to her attention. The problems with the [Premises] were reported to her many times. She reached out to the store manager and she tried to work with Mr. Veros . . . . He told her repeatedly that

things would be fixed and they were not. The best result that Ms. Schwartz said she could get out of him on any given issue was a "band aid" fix, nothing that ever resolved an issue. . . . She noted repeated excuses and delays from the [L]andlord. The jury saw many emails that were intended to show the lack of response and unfulfilled promises that Ms. Schwartz was experiencing. The emails contained repeated requests by [Sears'] representatives to achieve maintenance and adequate repairs at the [Premises] and representations that the work would be performed. When Mr. Veros was replaced by Mr. LoFredo, a new director of property management, Ms. Schwartz noted that things did not improve. There were more emails presented, showing more representations . . . .

James Terrell, the vice president of real estate holding for Sears, testified that the subject property was trending negatively financially from the time that the complaints about maintenance and repairs began in 2008. While the [L]ease itself was . . . a below[-]market[-]value rental, Mr. Terrell stated that this Sears store closed because the [Premises] had deteriorated. He described the store closing as "death of 1000 knives," deterioration caused by the cumulative effect over a number of years of promises made and promises never kept. He stated that Sears was forced to close the store and discontinue use of the [Premises] for its intended purpose due to the "thousand knives[."] Sears decided to close its store in December 2011 and sent a termination of operations letter in January 2012.[4] Mr. Terrell reached out to Mr. [Barry] Lustig at Ashkenazy regarding his repair and maintenance issues with the [Premises,] and Mr. Lustig's first response to Mr. Terrell was a buyout offer. . . . They constantly were being told that they were getting bids or proposals to do work and they never came through. Ashkenazy said that they had engaged an engineer to fix the garage when they had not. They repeatedly said the garage would be fixed and it was not, even after violations were cited by Upper Darby Township. Mr. Terrell became aware at some point that Ashkenazy was talking to alternative tenants and he said that it is not unusual for them to be looking at alternative tenants. However, what was unusual was for

---

[4] The ultimate liquidation and closure of the store was completed in May 2012.

Ashkenazy to be looking at a tenant (in this case on that would require demolition of the existing structures) when the existing tenant, Sears, had so much time left on the [L]ease.

T.C.O. at 10-16 (citations to the certified record omitted).

Appellants' argument that the evidence was insufficient to establish the requisite level of injury includes the following review of case law:

Well-reasoned cases applying Pennsylvania law persuasively hold that a [l]andlord's failures to provide maintenance, make repairs or comply with local building codes do **not** provide a sufficient legal basis for a finding of constructive eviction unless those failures result in substantial interference with the [t]enant's possession of the premises by causing a nearly total deprivation of the ability to use the premises for the purpose contemplated by the [l]ease. *See, e.g., Rittenhouse v. Barclay White, Inc.*, 625 A.2d 1208 (Pa. Super. 1993) (granting the landlord's preliminary objections in the nature of a demurrer to tenant's constructive eviction claim . . . [when] the town agreed to allow the tenant to remain in possession of the premises while the landlord corrected the building code violation).

Federal courts applying Pennsylvania law likewise repeatedly have rejected, as a matter of law, constructive eviction claims based on a landlord's failure to perform maintenance, make repairs or comply with building codes. *See Wm. H. McGee & Co. v. Richard I. Rubin & Co.*, No. Civ. 95-0237, 1995 WL 366075 (E.D. Pa. June 20, 1995) (applying Pennsylvania law and granting the landlord's motion to dismiss a constructive eviction claim, holding that the landlord's "failure to properly maintain [a] building and failure to comply with applicable building codes," which may have contributed to the spread of a fire at the premises, did not constitute "deliberate actions serving to render the premises unsuitable for the purpose for which it was leased"); *W.G. Nichols, Inc., v. Ferguson*, No. Civ.A. 03-824, 2004 WL 868222 (E.D. Pa. Apr. 21, 2004) (interpreting Pennsylvania case law and granting summary judgment in favor of landlords/defendants on tenant's constructive eviction claim when tenant failed to demonstrate any "affirmative wrongful act on the part of the landlord[s]" because a landlord's "failure to comply with applicable building codes will rarely constitute a breach of the covenant of quiet

- 14 -

enjoyment absent 'an affirmative wrongful act on the part of the landlord which results in an interference with the tenant's possession'").

In order for a landlord's failure to maintain or repair the premises or comply with local building codes to constitute a constructive eviction, the tenant must establish that the landlord, for all intents and purposes, made it **impossible** for the tenant to use the premises in the manner contemplated by the [l]ease. *See, e.g., Elfman v. Berman*, 56 Pa. D. & C.4th 171, 184 (Phila. Cty. May 8, 2001) (holding that landlord's failure to "comply with the City code" to the point that the city "shut down the building," coupled with the landlord's affirmative wrongful acts of "changing the locks" and refusing to take steps to remove the code violations such that the City would re-open the building supported a finding of constructive eviction); *Vakos v. Hoff*, 30 A.2d 367, 390 (Pa. Super. 1943) (finding a building untenantable when the defendant landlord "started to raze the building, tearing down partitions and taking out windows"); *Checker Oil Co.*, 380 A.2d at 819 (holding that the landlord had rendered the premises unsuitable for use as a gas station when the landlord cut off direct access to the gas station from the main road).

Sears' own evidence plainly demonstrated that Sears continuously operated the Premises for the purpose contemplated by the Lease. Sears' cash registers did not lie; they conclusively established Sears' ability to operate the Premises as a full-line department store as the Lease contemplated. . . .

* * * *

Sears and its customers actively used the parking garage and the department store every business day until May 2012 when Sears completed its liquidation sale . . . .

Brief for Appellants at 37-40 (emphasis in original; citations modified).

Sears responds that Appellants' argument isolates each of Sears' numerous issues, and establishes no more than that each maintenance failure, standing alone, did not suffice to warrant a constructive eviction.

Sears maintains that it is the cumulative effect of all of the problems for which it provided evidentiary support at trial—the "thousand knives"—that amounted to constructive eviction, and that they must be considered in concert rather than separately. We agree.

We begin by reviewing Appellants' case law. In **Wm. H. McGee**, an unreported federal decision that does not bind this Court, the district court did not speak as broadly as Appellants suggest. Rather, the court rejected the plaintiff's constructive eviction claim because the plaintiff had "not suggest[e]d that [defendant-lessor] engaged in deliberate actions serving to render the premises unsuitable for the purpose for which it was leased." 1995 WL 366075, at *4 (quoting **Pollock**, 369 A.2d at 460). Thus, it is a reach to cite this case for a proposition that stretches beyond the narrow facts at issue therein.

Although court of common pleas decisions provide, at most, persuasive but not binding authority, we note that Appellants' reliance upon **Elfman** is misplaced insofar as substantial revisions were made upon reconsideration. **See Elfman v. Berman**, no. 2080, control no. 70359 2001 WL 1807940 (CCP Phila. Cty. Aug. 30, 2001). Furthermore, nothing about the court's decision in **Elfman**, which involved an extraordinarily gratuitous and unabashed effort to oust the plaintiff-tenant, suggests that "the tenant **must** establish that the landlord . . . made it impossible for the tenant to use the premises in the manner contemplated by the lease," as Appellants

maintain, Brief for Appellants at 38-39 (emphasis modified), only that such evidence is sufficient to establish a constructive eviction.

While Appellants' description of the facts in **Vakos** is accurate, nothing in that decision suggests that "impossibility" in the sense ventured by Appellants is actually **required** to sustain a constructive eviction claim, only that when such impossibility is presented constructive eviction **will** be found. Notably, not only did **Checker Oil** state the governing standard less dramatically than the proposition for which it is cited, **see** 380 A.2d at 819 ("[T]he utility of the premises must be substantially decreased by the landlord's interference . . . ."), but it also found constructive eviction when one means of entry—amongst several, albeit others were indirect[5]—to the complainant gas station were blocked by the landlord.

Our own review of Pennsylvania case law has turned up no truly on-point authority. Instead, most cases involve either utterly untenable landlord conduct or a circumstance involving less far-reaching and enduring problems than Sears' evidence established in this case. Thus, we must infer certain principles from the cases we do have and determine whether the jury's verdict fits within their bounds such that the trial court had a valid basis for denying JNOV.

---

[5]     **See Checker Oil**, 380 A.2d at 817 & n.4.

We find guidance in our decision in **Pollock**. However, to contextualize our review of that case, we first must note that constructive eviction is one species of a violation of the lessee's right to quiet enjoyment. While one might gain relief for such a violation without being constructively evicted, one cannot be constructively evicted absent such a violation. In effect, constructive eviction occurs when a lessor's violation of a lessee's entitlement to quiet enjoyment is so extreme as to interfere seriously with the lessee's ability to use the leasehold as it was intended to be used, and the violation prompts the tenant to abandon the property within a reasonable amount of time. This explanation is necessary because **Pollock** involved a violation of the right to quiet enjoyment, not a constructive eviction. Nonetheless, **Pollock** provides guidance as to how a landlord's actions may constitute a crippling violation of a business tenant's right of quiet enjoyment, as reflected in its reliance upon numerous constructive eviction cases, including **Wm. H. McGee**, *supra*.[6]

In **Pollock**, the plaintiff purchased a dry cleaning business located in a shopping center. In tandem with his purchase, he entered into a seven and

---

[6] Notably, in **Pollock**, in reviewing the principles that govern quiet enjoyment, this Court drew heavily from constructive eviction cases such as **Kelly v. Miller**, 94 A. 1055 (Pa. 1915) (holding that blocking certain rooms in a theater, but not the theater itself, constituted a constructive eviction), and **McCandless v. Finley**, 86 Pa. Super. 288 (1925) (finding constructive eviction where, after execution of lease with plaintiff but before plaintiff occupied the premises, defendant removed various plumbing and electric fixtures).

one half-year lease with the defendant lessor. At the time he entered into the lease, the dry cleaner was located in a prominent location, with parking spaces as close as twenty feet to the store's entry. As well, the dry cleaner was located next to a grocery store, a manifestly optimal location for the business. *See* 369 A.2d at 459-60.

Less than a year after the parties entered the lease, and without prior notice, the lessor began construction to expand the shopping center by adding structures that effectively enclosed and surrounded plaintiff's business.

> [After the construction, the dry cleaner was] no longer occupying an outside store with visible display windows next to a parking lot. Instead, [it] now [had] a six and one half[-]year lease for one of eleven shops in a mall that extend[ed] over what had formerly been the small parking area [near the dry cleaner]. A store [was] located directly in front of the cleaning establishment and access [was] gained by entering a set of double doors into the mall and proceeding down a hallway. The display windows [were] only visible from inside the mall and [could] be completely viewed only when a customer . . . passed through the double doors, traveled the full length of the hallway and turned the corner. The sign once directly over the store [was] outside the mall over the discount center[,] which [was] the store directly in front of the [dry cleaner]. The nearest parking spaces . . . [were] 100 feet away.

*Id.* at 460.

The trial court found that the landlord had not violated his covenant of quiet enjoyment. The parties ultimately agreed that the plaintiff could vacate the premises and be released from his obligations under the Lease, hence any suggestion of a constructive eviction had become moot.

However, the plaintiff's claim for damages arising from the situation remained, and was the subject of the plaintiff's appeal to this Court. *See id.*

This Court concluded as follows:

[T]he utility of the property leased [was] substantially decreased due to the basic structural changes wrought by the landlord. . . . [T]he attractive features of the demised premises were eliminated by the acts of the landlord. These acts substantially interfered with the tenant's anticipated use of the premises and represent a breach of the covenant of quiet enjoyment.

The use of windows and pathways granting access to the leased structure, as well as a visible location, has been found in other jurisdictions to be protected by the covenant for quiet enjoyment. Thus in *Owsley v. Hamner*, 227 P.2d 263 (Cal. 1951)[,] it was held that where tenants leased a store which enjoyed an adjacent patio with display windows and passageways connecting the patio with the store and two streets, an attempt by the landlord to close the passages and eliminate the patio would be detrimental to the tenants' business and so substantially impair the leased premises as to violate the covenant of quiet enjoyment. . . . The Supreme Court of Massachusetts in *Winchester v. O'Brien*, 164 N.E. 807 (Mass. 1929)[,] found for the tenant on the basis of similar reasoning[,] stating that a substantial and continued interference with the tenant's dentistry practice occurred when the noise, dirt and obstruction of prolonged construction embarked upon by the landlord, plus sporadic interruptions of utilities incident thereto, impaired the character and value of the leased premises.

*Pollock*, 369 A.2d at 461-62 (citations modified; footnotes omitted).

This Court also favorably cited other out-of-jurisdiction cases, including *Reste Realty Corp. v. Cooper*, 251 A.2d 268 (N.J. 1969), which warrants discussion. In *Reste Realty*, an office tenant's demised premises were regularly penetrated by water during rainstorms, evidently due to poor grading of a driveway adjacent to the exterior wall. After a period of time

- 20 -

during which the first landlord would promptly address these problems as they arose, a successor landlord took control of the property and was less responsive to the tenant's complaints. After more than two years of these problems, the tenant vacated the premises. The landlord filed suit to recover unpaid rent from the tenant for the balance of the lease term. *Id.* at 271. The trial court agreed with the defendant-tenant that the evidence "overwhelmingly" established that the water penetration coupled to the landlord's lack of remediation and the substantial deprivation of tenant's ability to use the premises constituted a constructive eviction. *Id.*

The New Jersey Supreme Court agreed.

Where there is [a covenant of quiet enjoyment] and it is breached substantially by the landlord, the courts have applied the doctrine of constructive eviction as a remedy for the tenant. Under this rule any act or omission of the landlord or of anyone who acts under authority or legal right from the landlord . . . which renders the premises **substantially unsuitable for the purpose for which they are leased, or which seriously interferes with the beneficial enjoyment of the premises**, is a breach of the covenant of quiet enjoyment and constitutes a constructive eviction of the tenant. . . .

Examples of constructive eviction having close analogy to the present case are easily found. . . . [W]hen the main waste pipe of an apartment building was permitted to become and remain clogged with sewage for a long period of time causing offensive odors and danger to health, the covenant of quiet enjoyment was breached and justified the tenant's abandonment of his premises. *McCurdy v. Wyckoff*, 63 A. 992 (N.J. Super. Ct. 1906). . . . The same rule was applied in *White v. Hannon*, 11 N.J.L.J. 338 (Dist. Ct. 1888)[,] where it appeared that the plumbing in the rooms to the rear of the demised premises became so old and worn out as to emit strong and unhealthy odors which came through into the tenant's quarters. The tenant's removal was held justified. . . .

[T]he trial court found sufficient interference with the use and enjoyment of the leased premises to justify the tenant's departure and to relieve her from the obligation to pay further rent. In our view the evidence was sufficient to warrant that conclusion . . . . If [the flooding's] recurrence follows regularly upon rainstorms and is sufficiently serious in extent to amount to a substantial interference with use and enjoyment of the premises for the purpose of the lease, the test for constructive eviction has been met.

*Reste Realty*, 251 A.2d at 274-75 (emphasis added; citations modified; additional harmonious case citations omitted).

Notably, the **Reste Realty** court addressed a second topic that also is raised by Appellants herein. Specifically, the landlord in that case argued that the tenant's ongoing occupancy despite the continuing issue with water penetration, *i.e.*, the tenant's failure to vacate the premises within a reasonable amount of time, amounted to a waiver of constructive eviction. Pennsylvania law offers very little guidance on what constitutes a reasonable amount of time, but the New Jersey Supreme Court's discussion of this issue is persuasive:

What constitutes a reasonable time depends upon the circumstances of each case. In considering the problem[,] courts must be sympathetic toward the tenant's plight. Vacation of the premises is a drastic course and must be taken at his peril. If he vacates, and it is held at a later time in a suit for rent for the unexpired term that the landlord's course of action did not reach the dimensions of constructive eviction, a substantial liability may be imposed upon him. That risk and the practical inconvenience and difficulties attendant upon finding and moving to suitable quarters counsel caution.

*Id.* at 277. Thus, in **Reste Realty**, the fact that the plaintiff continued his occupancy while complaining to his landlord for nearly one year (and despite

the fact that the problem had actually persisted for years including the prior, more responsive landlord's tenure) was not dispositive against constructive eviction.

We find that **Pollock** and **Reste Realty**, in tandem with our standard of review, which counsels restraint in granting JNOV, support affirmance of the trial court's ruling in the instant matter. **Pollock** stands for the proposition that a business' commercial "attractiveness" has bearing upon the constructive eviction inquiry in the commercial context. **Reste Realty** establishes that problems that might not constitute a constructive eviction were they isolated, rare, and promptly addressed by the landlord may rise to a constructive eviction when they persist, remain unremedied, and substantially interfere over time with the tenant's quiet enjoyment of the leasehold.

As the trial court's account of the evidence establishes, the jury heard extensive testimony regarding a panoply of problems that presented safety and sanitation hazards, made the Premises considerably less attractive to customers, and remained unremedied for years on end, despite Sears' frequent complaints. The jury also heard that Appellants not only insisted that they would rectify the problems, but also threatened Sears with default should Sears exercise its right under the Lease to address the problems itself and seek reimbursement from the Landlord. The jury heard testimony concerning the recurring remedial action Sears was required to take, ranging from replacing considerable amounts of carpet and drywall on several

occasions to installing supplementary lighting in the parking garage when Appellants failed adequately to maintain the original lighting. This evidence taken as a whole provided an adequate evidentiary basis upon which a jury could conclude that the complained of deficiencies and non-responsiveness were of "a substantial nature and so injurious to the tenant as to deprive [it] of the beneficial enjoyment of a part or the whole of the demised premises." *Kuriger*, 498 A.2d at 1338.

Furthermore, we find that a jury could have concluded that Sears vacated in a reasonable amount of time relative to the above-stated events. As did the tenant in *Reste Realty*, Sears exercised patience in seeking to remain in Appellants' increasingly dilapidated building rather than vacate at the first sign of trouble. It demonstrated faith in Appellants' willingness and ability to cure the maintenance issues when it renewed the Lease and rejected Appellants' buyout offers. It repeatedly remediated damage caused by Appellants' maintenance failures at its own expense. Under these circumstances, the jury reasonably could have concluded that Sears sought to adhere to the Lease until the thousandth cut finally prompted Sears to decide in December 2011 to begin the process of abandoning the Premises. That Sears did not physically vacate the Premises until May 2012 does not change our view. Packing up a department store is not a weekend's affair. As occurred in this case, an arduous process of winding down and liquidation must be undertaken to facilitate vacatur of the premises. As the court cautioned in *Reste Realty*, it is incumbent upon courts to be sympathetic to

the facts and circumstances of a given case. In this case, the scale of the Premises and Sears' operations therein provided a sufficient basis for a jury to have determined that Sears vacated reasonably promptly under the circumstances.[7]

We now turn to Appellants' contention that the Lease bound Sears to satisfy its rent obligation no matter how persistent or serious the neglect or how unresponsive the Landlord was to complaints about same. "[A] lease is in the nature of a contract and is controlled by principles of contract law." *Amoco Oil Co. v. Snyder*, 478 A.2d 795, 798 (Pa. 1984). "[W]here language is clear and unambiguous, the focus of interpretation is upon the terms of the agreement as *manifestly expressed*, rather than as, perhaps, silently intended." *Id.* (quoting *Steuart v. McChesney*, 444 A.2d 659, 661 (Pa. 1982)) (emphasis in original); *see Lott v. Guiden*, 211 A.2d 72, 75 (Pa. Super. 1965) ("Where . . . the lease is in writing and free of ambiguity

---

[7] We appreciate Appellants' suggestion that Sears' more or less contemporaneous decision to close well over a hundred stores at the same time that it decided to close the Upper Darby store could support the inference that Sears' decision was not driven by the state of the Premises or Appellants' record of neglect. However, we find it similarly plausible that the Upper Darby store was selected for inclusion in the group of stores to be closed because of Appellants' pattern of neglect. Certainly, the jury was free to draw such an inference. This evidence was put before the jury, and we can infer that the jury was unpersuaded that Sears pursued the instant action simply to escape a lease that no longer served its business interests. To supplant that judgment would exceed our province.

its interpretation and construction are for the court and words must be given their ordinary meaning.").

> The primary objective of a court when interpreting a contract is to ascertain the intent of the parties. *See Shovel Transfer & Storage, Inc. v. Penna. Liquor Control Bd.,* 739 A.2d 133 (Pa. 1999). When "a written contract is clear and unequivocal, its meaning must be determined by its contents alone." *Robert F. Felte, Inc. v. White*, 302 A.2d 347, 351 (Pa. 1973) (quoting *East Crossroads Center, Inc. v. Mellon–Stuart Co.,* 205 A.2d 865, 866 (Pa. 1965)). Courts are not to assume that a contract's language was chosen carelessly or that the parties were ignorant of the meaning of the language they utilized. *Steuart*, 444 A.2d at 662.

*Seven Springs Farm, Inc. v. Croker*, 801 A.2d 1212, 1215 (Pa. 2002).

Appellants contend that "plain and unambiguous" provisions of the Lease "barred Sears from defending against the Landlord's counterclaim for unpaid rent based on allegations that the Landlord breached its duty to maintain and repair the Premises or otherwise breached the Lease." Brief for Appellants at 44. Thus, "the Lease did not give Sears any right to terminate the Lease if the Landlord failed to provide maintenance and repairs," and "Sears' constructive eviction claim plainly and impermissibly attempted to do exactly what the Lease forbids Sears from doing." *Id.* In support of their argument, Appellants rely exclusively upon the Lease itself. Notably, while they direct this Court by citation to sections of the Lease, they do not quote any of the language at issue, nor do they explain by reference to the terms utilized in the cited provisions of the Lease how those terms precluded Sears from seeking a rent abatement in the face of ongoing

neglect. This failure to develop a plain-language argument by specific discussion of the language in question arguably should be deemed fatal to their argument. *See Parker Oil Co. v. Mico Petro & Heating Oil, LLC*, 979 A.2d 854, 858 (Pa. Super. 2009).

In any event, Appellants' argument, such as it is, is unpersuasive. While they are correct that the Lease provided for tenant self-help and entitled Sears to seek reimbursement of the costs thereof, *see* Lease at 22-23 § 13, that does not, by itself, insulate Appellants from a constructive eviction claim and the associated rent-abatement. Our review of the cited provisions, which, given the deficiencies in Appellants' argument we shall not review at length, shows only that the Lease immunized Appellants from liability for "consequential damages or damages for loss of business" derived from its own nonperformance. Lease at 36 § 27(g); *see id.* at 23 § 13 (same). Moreover, the Lease expressly provided that the Landlord's breach of various covenants, including those at issue in this case, "shall be deemed a default of Landlord entitling Tenant to exercise its rights and remedies hereunder, **or otherwise available at law or equity**, including, without limitation, Tenant's right of self[-]help as set forth in Section 27(c)." *Id.* at 20 § 11(c) (emphasis added). Thus, the Lease appears to reflect the parties' intention that Sears would be entitled to pursue redress beyond self-help with reimbursement. Accordingly, this argument is unavailing.

For the foregoing reasons, we find that the trial court did not err or abuse its discretion in denying Appellants' motion for JNOV on Sears' claims

for constructive eviction. Thus, we affirm that ruling and proceed to the next issue.

In Appellants' next issue relating to constructive eviction, they contend that the trial court erroneously instructed the jury, in effect providing a less rigorous burden of proof than the law prescribes.

> Under Pennsylvania law, our standard of review when considering the adequacy of jury instructions in a civil case is to determine whether the trial court committed a clear abuse of discretion or error of law controlling the outcome of the case. It is only when the charge as a whole is inadequate or not clear or has a tendency to mislead or confuse rather than clarify a material issue that error in a charge will be found to be a sufficient basis for the award of a new trial.

*Hatwood v. Hosp. of the Univ. of Penna.*, 55 A.3d 1229, 1235 (Pa. Super. 2012) (quoting *Patton v. Worthington Assocs., Inc.*, 43 A.3d 479, 490 (Pa. Super. 2012)). "[A] trial judge has wide latitude in his or her choice of language when charging a jury, provided always that the court fully and adequately conveys the applicable law." *Id.*

In relevant part, the trial court instructed the jury as follows:

> A constructive eviction occurs when a tenant's possession is impaired by acts or omissions of the landlord or those acting under the landlord. The impairment of the tenant's possession need not be total, but the utility of the premises must be substantially decreased by the landlord's interference with a right or privilege which is necessary to the enjoyment of the premises. A finding of . . . constructive eviction suspends the tenant's obligation to pay rent. In order for a tenant to rely upon constructive eviction to avoid payment of the rent contracted for he must abandon the premises within a reasonable amount of time.

- 28 -

Notes of Testimony, 3/25/2014, at 97-98.

Appellants concede that the trial court's instruction drew directly from three of this Court's opinions, Brief for Appellants at 54 (citing, *inter alia*, **Jonnet**; **Checker Oil**, *supra*), but maintain that the trial court's charge, taken as a whole, had "a tendency to mislead or confuse rather than clarify a material issue," such that the jury's verdict cannot be sustained. **Id.** at 55-56 (citing **Pringle v. Rapaport**, 980 A.2d 159, 165 (Pa. Super. 2009)) (emphasis omitted). Their argument hinges upon the trial court's use of the phrase "the utility of the premises must be substantially decreased." Despite the fact that this language arises directly from well-settled case law, the contextual confusion that Appellants contend this instruction created lay in the trial court's failure to add to this language "the equally important context and limitations" reflected in the opinions from which it was drawn. **Id.** at 54.

What Appellants do not do is propose an alternate instruction. In suggesting that the trial court should have included "important context and limitations," Appellants rely upon the fact patterns at issue in the above-cited cases. However, it would be odd indeed, and arguably confusing or misleading, to instruct the jury specifically that, in **Checker Oil Co.**, relief was due because a barrier erected by the landlord "made it impossible for automobiles to enter or exit the gas station from the main traffic route on which the gas station had been located," or that, in **Jonnet**, quoting **Pollock**, this Court noted that in one prior case constructive eviction had

been found where the landlord denied the tenant access to the premises, and, in another, the landlord substantially altered an essential feature of the premises such that it became unsuitable for the purpose for which it was leased. *See* Brief for Appellants at 54-55.

It is not a standard practice, in relating the governing law to a jury, for a trial court to provide an exhaustive account of how the law has been applied in an array of prior decisions. Furthermore, the trial court's notation that the landlord's interference must impede "a right or privilege which is **necessary to the enjoyment of the premises**" does not substantively differ, by our reading, from Appellants' stated desire that the trial court emphasize that constructive eviction requires that the premises become "unsuitable for the purpose for which it was leased." We detect in the challenged jury instruction no clear abuse of discretion or error of law controlling the outcome of the case. Absent more compelling authority, or a showing of what instruction might have satisfied Appellants' concerns, and in light of the latitude we afford trial courts in fashioning their statements of the law, we must conclude that this issue is unavailing.

Next, we consider Appellants' second issue, in which they contend that the trial court erred in declining to enter JNOV as to Sears' claim against Ashkenazy for intentional interference with contractual relations. In support of this claim, Sears pleaded that Ashkenazy "intentionally and purposefully constrained Landlord from meeting its obligations, with the intent to allow the [Premises] to fall into disrepair." Amended Complaint at 12 ¶ 66. Sears

contended that Ashkenazy did so in an effort to drive Sears out of the space so that Ashkenazy could redevelop the site to a more profitable use. It averred that "Ashkenazy's intent was to drive a wedge between the Landlord and Sears and that they intentionally disrupted and interfered with the contractual relationship." *Id.* at 12 ¶ 70.

Pennsylvania law follows the Restatement (Second) of Torts § 766's standard for intentional interference with contractual relations:

> One who intentionally and improperly interferes with the performance of a contract . . . between another and a third person by inducing or otherwise causing the third person not to perform the contract is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

*Id.*; *see Daniel Adams Assocs., Inc., v. Rimbach Pub., Inc.*, 519 A.2d 997, 1000 (Pa. Super. 1987).

> Essential to a right of recovery under this section is the existence of a contractual relationship between the plaintiff and a "third person" other than the defendant. By definition, this tort necessarily involves three parties. The tortfeasor is one who intentionally and improperly interferes with a contract between the plaintiff and a third person.

*Daniel Adams Assocs.*, 519 A.2d at 1000.

Appellants' argument hinges upon their contention that Ashkenazy was not a stranger to the contract between Sears and the Landlord, but rather acted solely as the Landlord's leasing and development agent, which effectively made it a party to the Lease. Appellants correctly observe that, under Pennsylvania law, an "agent, servant, or employee" of a contracting

party, acting within the scope of his employment or engagement with that party, effectively stands in the shoes of the contracting party such that he/she/it is not a third party for purposes of establishing an intentional interference claim. Brief for Appellants at 49 (citing **Daniel Adams Assocs.**, 519 A.2d at 1000-01.

In relevant part, Appellants maintain as follows:

The undisputed evidence showed that the Landlord was a single-purpose corporate entity which had no employees and acted solely through its leasing and development agent[, Ashkenazy,] and management agent[,] AAC . . . . Sears conceded that [AAC] was the Landlord's agent and dismissed Sears' tortious interference claim against [AAC].

Sears did not present any evidence to show that [Ashkenazy] acted in any capacity other than as the Landlord's leasing and development agent or that [Ashkenazy] acted outside the scope of its authority as an agent. Indeed, in closing argument, counsel for Sears argued:

After all, the [L]andlord has no employees. The [L]andlord has no existence other than what Ashkenazy created it for—as an investment deal for itself and others . . . . The [L]andlord was a shell. It had no employees, no one to speak for it.

Thus, far from attempting to meet its burden to prove that [Ashkenazy] acted in some capacity other than as the Landlord's agent, Sears affirmatively argued that [Ashkenazy] made all the Landlord's decisions, including the decisions that Sears claimed constituted an interference with its contractual rights under the Lease. Sears did not, and could not, prove that [Ashkenazy] played a different role or that [Ashkenazy] in any way acted outside the scope of the authority the Landlord granted.

* * * *

Pennsylvania law clearly provides that an agent, officer or employee of a corporation that is party to a contract cannot be held liable for tortious interference with that contract because

> the agent, officer or employee advised the corporation to breach the contract.

Brief for Appellants at 50-51 (record citations omitted).

Interestingly, what Appellants cite as evidence that Ashkenazy was an agent of the Landlord is precisely what Sears cites as evidence that Ashkenazy was **not** the Landlord's agent. While Appellants insist that the Landlord's apparent lack of employees militate in favor of an agency finding, Sears notes, and Appellants concede by inference from the above assertion, that all decisions regarding whether and when repairs would be addressed were made by Ashkenazy in its own discretion. Sears notes that Ashkenazy, not the Landlord, engaged in continuing negotiations with Walmart, and that it was Ashkenazy, not the Landlord, that repeatedly offered to buy out the Lease. Furthermore, Appellants' assertions about the relationship between the Landlord and Ashkenazy, specifically their claim that the Landlord essentially had no independent volition at all, are problematic under the test for agency, inasmuch as the party seeking to establish an agency relationship must establish that the principal granted the agent "express authority" to act on its behalf or "authority that the principal has by words or conduct held the alleged agent out as having." ***See Volunteer Fire Co. of New Buffalo v. Hilltop Oil Co.***, 602 A.2d 1348, 1351 (Pa. Super. 1992). A corporation such as the Landlord, described by Appellants as having no employees, nor, evidently, any individual function, would be hard pressed to grant express or apparent authority. Furthermore, there is no question that

the Landlord had at least one agent; the parties agreed that AAC was the Landlord's property management agent, and Sears voluntarily agreed to AAC's dismissal from its claim for intentional interference on that basis. The record is less clear with regard to Ashkenazy.

In any event, the trial court's explanation is based upon different reasoning and evidence:

> **The burden of proving agency is on the party who seeks to assert it**. *Volunteer Fire Co.*, 602 A.2d at 1351. "Under Pennsylvania law, in seeking to establish that one has acted as the agent of another, the burden of showing authority so to act lies on the person who avails himself of such acts in order to charge a third person as principal . . . ." *James v. Duquesne Univ.*, 936 F.Supp.2d 618 (W.D. Pa. 2013); *Zukowski v. Baltimore & O. R. Co.*, 315 A.2d 622 (3d Cir. 1962). In the instant matter, [Ashkenazy] seeks to escape liability for intentional interference by claiming that it was the [L]andlord's agent and that property management (the authorization of maintenance and repairs) was within the scope of its authority. [Appellants], however, did not present evidence that [Ashkenazy] was the property management agent for the [L]andlord, nor did they present any evidence that Ashkenazy had the apparent authority of the [L]andlord to act as the property manager and to control whether repairs were completed [on the Premises] (Ashkenazy was the leasing agent for the demised premises and an investor in the [L]andlord). [Appellants] admitted in their Answer to the Amended Complaint that AAC was the management company [for Landlord] and that they provided certain property management. Answer to Amended Complaint ¶ 7. They denied that Ashkenazy was the corporate principal that controlled [Landlord] and further stated that [Ashkenazy] was an "independent legal entity that directs and exercises controls over its own activities." *Id.* ¶ 8 (emphasis added). [Appellants] admitted that Ashkenazy was not the parent company of AAC and that Ashkenazy was the leasing agent for the [L]andlord. *Id.* ¶ 15.
>
> [Appellants] have admitted that [Ashkenazy] was the [L]andlord's agent for leasing and development and that [AAC]

- 34 -

was the property manager and [Appellants] did not present any testimony that Ashkenazy was the property manager for [the Premises] or authorized to act as the property manager. ***See*** Testimony of Barry Lustig and Daniel Iwanicki; Defendants and Counterclaim Plaintiffs' Response to Plaintiff's Bench Brief Regarding Punitive Damages for Claims of Intentional Interference with Contractual Relations, 3/24/2014; Amended Complaint ¶ 7; Answer to Amended Complaint ¶ 7. The question for the jury then was whether the conduct of Ashkenazy was outside of the scope of its agency, outside of its leasing and development role.

T.C.O. at 31-32 (emphasis in original; citations modified; unclosed quotation mark omitted). The trial court went on to observe that no one objected to the trial court's jury instruction regarding agency, and that it specifically charged the jury that an agent cannot be held liable for intentional interference with contractual relations when the principal is a party to the contract in question. Per its verdict slip, the jury specifically held that Ashkenazy was not acting as an agent for the Landlord, and awarded damages for intentional interference.

Reviewing Appellants' argument, it is clear that they misapprehend the burden in this case, focusing upon evidence that Sears allegedly failed to produce, including whether Ashkenazy "acted in any capacity other than its role as the Landlord's leasing and development agent." Brief for Appellants at 49. As the trial court correctly observed, however, the burden lay with Appellants to establish Ashkenazy's agency status vis-à-vis the Landlord. ***See Volunteer Fire Co.***, 602 A.2d at 1351 ("The party asserting an agency relationship has the burden of proving it by a fair preponderance of the evidence."). Furthermore, the evidence established that Ashkenazy's

interests extended well beyond this project to others, and that it had an ownership interest in the Landlord such that events redounding to the Landlord's benefit would, directly or indirectly, be beneficial to Ashkenazy as well.

It appears to us that Ashkenazy and Appellants generally seek to be shielded from the consequences of their own complex corporate structure. Establishing separate corporate entities with separate agendas in connection with the same individuals and the same deal may be legally expedient in certain connections, but in others it may prove disadvantageous, as when one is called upon to establish itself as exclusively a corporate agent of another corporation. Nothing in Appellants' argument establishes that it satisfied its burden of establishing such agency, and we will not rely upon conclusory assertions to countermand the jury's findings, based upon unchallenged jury instructions and extensive evidentiary showings, that Ashkenazy was not acting as the Landlord's agent when it interfered with the Landlord's satisfaction of its Lease-derived obligations to Sears. Accordingly, the trial court did not err in denying Appellants' motion for JNOV in connection with this award.

Appellants' secondary argument in support of JNOV arises from the damages awarded by the jury for this intentional interference claim: The jury awarded $66,119.30 in damages, which is precisely the amount Sears alleged it had spent on self-help in connection with the neglect at issue in this case. Appellants argue that "[n]o evidence existed that [Ashkenazy]

played any role in preventing Sears from collecting the $66,119.30 which the Landlord acknowledged it owed." Brief for Appellants at 51. "Obviously," Appellants argue, "the jury returned its verdict in favor of Sears and against [Ashkenazy] on the tortious interference claim only to ensure that Sears would recover the $66,119.30 in self-help expenses that the Landlord admitted it owed to Sears." *Id.* at 52. "As a matter of clear Pennsylvania law," Appellants continue, "[Ashkenazy] bore no responsibility for that amount." *Id.*

First, we note that, while the identity of the numbers is suggestive, we cannot be certain that the jury arrived at these damages for the reason posited, and we should not speculate. Second, while Appellants maintain that "clear Pennsylvania law" precludes such an award, they cite no such law, and we are aware of none. The jury found that Ashkenazy, acting outside the scope of any agency for the Landlord, intentionally interfered with Sears' contractual relationship with the Landlord, a finding that entitled Sears to damages. The jury imposed damages upon Ashkenazy based upon this conclusion. Appellants identify no legal basis upon which to overturn the jury's determinations, and we will not do so.[8]

---

[8] Although this does not factor into our analysis, we note that it is not clear that Sears ever **received** the reimbursement from the Landlord that the Landlord allegedly was willing to provide. Thus, the record is devoid of any indication that Sears had actually been made whole at the time the jury reached its verdict. Furthermore, if the Landlord expected to remit a
*(Footnote Continued Next Page)*

We find no error in the fashion in which the trial court submitted the question of agency and the claim of intentional interference with contractual relations to the jury. We find no error in the jury's finding of liability upon this claim, nor in its award of damages. Accordingly, Appellants were not entitled to JNOV on that claim.

This brings us to the final issue, Sears' claim that the trial court erred in refusing to instruct the jury on Sears' claim for punitive damages. Sears contends that "Ashkenazy, acting for its own interests and not as [an] agent of [the] Landord, prevented [AAC from acting,] causing [Landlord] to breach the Lease." Brief for Sears at 32.

Sears correctly notes that Pennsylvania law allows punitive damages to be assessed for intentional interference with contractual relations. *See Empire Trucking Co., Inc., v. Reading Anthracite Coal Co.*, 71 A.3d 923 (Pa. Super. 2013). In Pennsylvania, "punitive damages are awarded for outrageous conduct, that is, for acts done with a bad motive or with a reckless indifferent to the interests of others." *Judge Technical Servs., Inc., v. Clancy*, 813 A.2d 879, 889 (Pa. 2002) (emphasis and internal quotation marks omitted). "[P]unitive damages are penal in nature and are proper only in cases where the defendant's actions are so outrageous as to demonstrate willful, wanton or reckless conduct." *Empire Trucking*,

*(Footnote Continued)* ————————

payment in this amount regardless of the trial outcome, it presumably could transfer that amount to Ashkenazy to balance the books as it prefers.

71 A.3d at 937 (quoting **Hutchison v. Luddy**, 870 A.2d 766, 770 (Pa. 2005)). "The state of mind of the actor is vital. The act, or the failure to act, must be intentional, reckless or malicious." **Hutchison**, 870 A.2d at 770.

The trial court explained that it declined to instruct the jury regarding punitive damages because, although Ashkenazy's conduct could have been construed by a jury as indicating that Ashkenazy caused the Landlord to breach its duty to maintain and repair the premises, "the record was devoid of evidence from which a jury could conclude that [Ashkenazy's] conduct rose to the level of outrageousness (close to criminal) allowing for the award of punitive damages." T.C.O. at 22. In the trial court's view, because the evidence was insufficient to establish the "willful, reckless **and** outrageous conduct" necessary to sustain such damages, such an instruction was not warranted. **Id.** at 21 (emphasis added).

Interestingly, the trial court misquotes our decision in **Empire Trucking** to make the common standard for punitive damages conjunctive rather than disjunctive, a misapprehension that appears to have tinged its ruling. **Compare** T.C.O. at 21 ("willful, reckless **and** outrageous conduct" (emphasis added) **with Empire Trucking**, 71 A.3d at 937 ("willful, wanton **or** reckless conduct" (emphasis added)). To similar effect, the trial court,

without a citation to support it, interjected the "almost criminal" qualification.[9]

Importantly, the trial court's recitation of the inferences and conclusions that the evidence did support painted a very negative picture of Ashkenazy's conduct:

> [T]he testimony and both direct and circumstantial evidence could reasonably be construed as revealing that Ashkenazy caused the [L]andlord's property managers [*i.e.*, AAC] to stall repairs to the [Premises], despite repeated assurances to Sears that said maintenance and repairs would take place, to force Sears to vacate the [Premises] so that it could be rented to an alternate, more attractive tenant. Ashkenazy exceeded 'the rules of the game' by causing the [L]andlord to fail to fulfill the terms of [the Lease] . . . .

T.C.O. at 22.

By way of legal analysis, the trial court considered only ***Empire Trucking***, which it found to be distinguishable from the instant case. In ***Empire Trucking***, a jury found intentional interference with contractual relations when the defendant, who had retained a trucking concern that utilized subcontractors to fulfill its responsibilities under its contract with the defendant, willfully sought to undermine the trucking company's contracts with its subcontractors in an effort to cut out the middleman, freeing itself to enter into more favorable deals directly with the subcontractors. ***See***

_____

[9] Based upon our review of Pennsylvania law, the phrases "punitive damages" and "almost criminal" have never appeared in the same appellate decision.

71 A.3d at 926-30. In that case, the plaintiff presented evidence that the defendant stopped paying the plaintiff, despite repeatedly and disingenuously assuring the plaintiff that the check was coming. The defendant's non-payment created financial strain for both the plaintiff and its subcontractors. The defendant then contacted the subcontractors and offered to retain them directly, but on terms that were more favorable to the defendant than those the defendant had agreed to with the plaintiff. The defendant also assured the subcontractors that it had fully paid the plaintiff, thus creating the impression that the plaintiff was wrongfully withholding payment to the subcontractors. The financial duress imposed upon the subcontractors by this course of conduct prompted them to accept the deal proposed by the defendant. *Id.* at 935. This Court determined that this evidence was sufficient to support the jury's award of punitive damages. *See id.* at 936-38.

> The trial court distinguished *Empire Trucking* as follows:
>
> In *Empire Trucking*, the defendant lied to a party to the contract in question **to induce** the party to breach and stop working for the plaintiff. In the instant matter, however, Ashkenazy made no false representations to induce the [L]andlord . . . to breach its duty to maintain and repair the [P]remises.

T.C.O. at 22. However, we find no basis in the law upon which to conclude that only an effort to induce a party to breach a contract will support punitive damages in a case of intentional interference with contractual relations. Indeed, we find more probative the language used to describe the

- 41 -

claim: "Interference," as such, may arise under other circumstances designed to have the same result, and there is nothing to suggest that other such efforts, when undertaken with sufficiently outrageous intent, cannot as a matter of law support an award of punitive damages.

The governing standard, disjunctive as stated in case after case, provides that punitive damages may be awarded when an act, or a failure to act, is intentional, reckless, **or** malicious. *Hutchison*, *supra*. In a similar common formulation, malicious is replaced with "outrageous." ***See Empire Trucking***, *supra*. In this case, the trial court underscored that the evidence could sustain a jury verdict—and indeed did—that was based upon the jury's conclusion that Ashkenazy knowingly and intentionally interfered with the Landlord's fulfillment of its obligations under the Lease, and that it did so not out of laziness or indifference, but specifically to drive Sears out of the Premises so that Ashkenazy could reach a presumably more remunerative deal with another tenant. This pattern emerged after Sears rejected Ashkenazy's first offer to buy out the balance of the Lease. That is to say, Ashkenazy, a third-party to the Lease, sought a result beneficial to its own interest first by fair means and then by foul.

Contrary to the trial court's conclusions, we find ***Empire Trucking*** very similar to the case *sub judice*. As in that case, Ashkenazy recognized that, by undermining one contract, it could engender a more beneficial business arrangement with another party. It then engaged in a course of conduct, spanning years, that interfered with the Landlord's fulfillment of its

own contractual responsibilities specifically to induce Sears to breach the contract or to abandon it by accepting a buy-out, despite the fact that Sears' patience in the face of the failures of maintenance and its rejection of several buy-out offers signaled its desire to continue doing business on the Premises, as it had contracted to do.

We agree with Sears that a jury reasonably could have concluded that Ashkenazy's interference with the Landlord's performance of its obligations under the Lease rose to the high standard that must be met to support an award of punitive damages. Whether the jury would have so concluded in this case is not for us to consider. However, the trial court's failure to instruct the jury on punitive damages denied Sears the opportunity to seek such an award. Consequently, Sears is entitled to a new trial restricted to its claim for punitive damages.

For the foregoing reasons, we must vacate the judgment and remand for a new trial to determine whether Sears is entitled to punitive damages. However, this ruling is not intended to, and shall not, disturb the other aspects of the judgment entered by the trial court following the first trial.

Judgment vacated. Case remanded. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>10/2/2015</u>