RESTE REALTY CORPORATION, A CORPORATION OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. JOY M. COOPER, DEFENDANT-APPELLANT.

Argued November 18, 1968—Decided March 17, 1969.

446

Mr. *John J. Baldino* argued the cause for appellant (*Messrs. Calissi, Gelman & Cuccio,* attorneys).

Mr. *William S. Katchen* argued the cause for respondent (*Mr. David N. Ravin,* of counsel; *Messrs. Ravin & Ravin,* attorneys).

The opinion of the court was delivered by

FRANCIS, J. Plaintiff-lessor sued defendant-lessee to recover rent allegedly due under a written lease. The suit was based upon a charge that defendant had unlawfully aban-

doned the premises two and a quarter years before the termination date of the lease. The trial court, sitting without a jury, sustained tenant's defense of constructive eviction and entered judgment for defendant. The Appellate Division reversed, holding (1) the proof did not support a finding of any wrongful act or omission on the part of the lessor sufficient to constitute a constructive eviction, and (2) if such act or omission could be found, defendant waived it by failing to remove from the premises within a reasonable time thereafter. We granted defendant's petition for certification. 51 *N. J.* 574 (1968).

On May 13, 1958 defendant Joy M. Cooper, leased from plaintiff's predecessor in title a portion of the ground or basement floor of a commercial (office) building at 207 Union Street, Hackensack, N. J. The term was five years, but after about a year of occupancy the parties made a new five-year lease dated April 1959 covering the entire floor except the furnace room. The leased premises were to be used as "commercial offices" and "not for any other purpose without the prior written consent of the Landlord." More particularly, the lessee utilized the offices for meetings and training of sales personnel in connection with the business of a jewelry firm of which Mrs. Cooper was branch manager at the time. No merchandise was sold there.

A driveway ran along the north side of the building from front to rear. Its inside edge was at the exterior foundation wall of the ground floor. The driveway was not part of Mrs. Cooper's leasehold. Apparently it was provided for use of all tenants. Whenever it rained during the first year of defendant's occupancy, water ran off the driveway and into the offices and meeting rooms either through or under the exterior or foundation wall. At this time Arthur A. Donigian, a member of the bar of this State, had his office in the building. In addition, he was an officer and resident manager of the then corporate-owner. Whenever water came into the leased floor, defendant would notify him and he would take steps immediately to remove it. Obviously Donigian

was fully aware of the recurrent flooding. He had some personal files in the furnace room which he undertook to protect by putting them on 2 x 4's in order to raise them above the floor surface. When negotiating with defendant for the substitute five-year lease for the larger space, Donigian promised to remedy the water problem by resurfacing the driveway. (It is important to note here that Donigian told Walter T. Wittman, an attorney, who had offices in the building and who later became executor of Donigian's estate, that the driveway needed "regrading and some kind of sealing of the area between the driveway which lay to the north of the premises and the wall." He also told Wittman that the grading was improper and was "letting the water into the basement rather than away from it.") The work was done as promised and although the record is not entirely clear, apparently the seepage was somewhat improved for a time. Subsequently it worsened, but Donigian responded immediately to each complaint and removed the water from the floor.

Donigian died on March 30, 1961, approximately two years after commencement of the second lease. Whenever it rained thereafter and water flooded into the leased floor, no one paid any attention to defendant's complaints, so she and her employees did their best to remove it. During this time sales personnel and trainees came to defendant's premises at frequent intervals for meetings and classes. Sometimes as many as 50 persons were in attendance in the morning and an equal number in the afternoon. The flooding greatly inconvenienced the conduct of these meetings. At times after heavy rainstorms there was as much as two inches of water in various places and "every cabinet, desk and chair had to be raised above the floor." On one occasion jewelry kits that had been sitting on the floor, as well as the contents of file cabinets, became "soaked." Mrs. Cooper testified that once when she was conducting a sales training class and it began to rain, water came into the room making it necessary to move all the chairs and "gear" into another

room on the south side of the building. On some occasions the meetings had to be taken to other quarters for which rent had to be paid; on others the meetings were adjourned to a later date. Complaints to the lessor were ignored. What was described as the "crowning blow" occurred on December 20, 1961. A meeting of sales representatives from four states had been arranged. A rainstorm intervened and the resulting flooding placed five inches of water in the rooms. According to Mrs. Cooper it was impossible to hold the meeting in any place on the ground floor; they took it to a nearby inn. That evening she saw an attorney who advised her to send a notice of vacation. On December 21 she asked that the place be cleaned up. This was not done, and after notifying the lessor of her intention she left the premises on December 30, 1961.

Plaintiff acquired the building and an assignment of defendant's lease January 19, 1962. On November 9, 1964 it instituted this action to recover rent for the unexpired term of defendant's lease, i. e., until March 31, 1964.

At trial of the case defendant's proofs showed the facts outlined above. Plaintiff offered very little in the way of contradiction. It seemed to acknowledge that a water problem existed but as defense counsel told the court in his opening statement, he was "prepared to show that the water receded any number of times, and therefore the damage, if it was caused by an act that can be traced to the landlord, [the condition] was not a permanent interference" with the use and enjoyment of the premises. Plaintiff contended further that the water condition would not justify defendant's abandonment of the premises because in the lease she had stipulated that prior to execution thereof she had "examined the demised premises, and accept[ed] them in their [then] condition * * *, and without any representations on the part of the landlord or its agents as to the present or future condition of the said premises"; · moreover she had agreed "to keep the demised premises in good condition" and to "redecorate, paint and renovate the said premises as

may be necessary to keep them in good repair and good appearance."

The trial judge found that the "testimony is just undisputed and overwhelming that after every rainstorm water flowed into the leased premises of the defendant" and nothing was done to remedy the condition despite repeated complaints to the lessor. He declared also that the condition was intolerable and so substantially deprived the lessee of the use of the premises as to constitute a constructive eviction and therefore legal justification for vacating them.

On this appeal the plaintiff-landlord claims that under the long-settled law, delivery of the leased premises to defendant-tenant was not accompanied by any implied warranty or covenant of fitness for use for commercial offices or for any other purpose. He asserts also that by express provision of both the first and second leases (which are identical printed forms, except that the second instrument covers the additional portion of basement floor), the tenant acknowledged having examined the "demised premises," having agreed to accept them in their "present condition," and having agreed to keep them in good repair, which acknowledgment, as a matter of law, has the effect of excluding any such implied warranty or covenant.

It is true that as the law of leasing an estate for years developed historically, no implied warranty or covenant of habitability or fitness for the agreed use was imposed on the landlord. Because the interest of the lessee was considered personal property the doctrine of *caveat emptor* was applied, and in the absence of an express agreement otherwise, or misrepresentation by the lessor, the tenant took the premises "as is." 1 *American Law of Property* (*Casner ed.* 1952) § 3.45, p. 267; 2 *Powell on Real Property* (1967) ¶ 221 [2], p. 185; and see *Faber v. Creswick,* 31 *N. J.* 234, 238 (1959); *Michaels v. Brookchester, Inc.,* 26 *N. J.* 379, 382 (1958). Modern social and economic conditions have produced many variant uses and types of leases, *e. g.,* sale and leaseback transactions, mortgaging of leasehold interests, shopping

center leases, longterm leases. Moreover, an awareness by legislatures of the inequality of bargaining power between landlord and tenant in many cases, and the need for tenant protection, has produced remedial tenement house and multiple dwelling statutes. See *e. g., N. J. S. A.* 55:134-1 *et seq.* and the regulations thereunder; see generally Fuerstein and Shustack, "Landlord and Tenant — The Statutory Duty to Repair," 45 *Ill. L. Rev.* 205 (1950); Annotation, 17 *A. L. R. 2d* 704 (1951). It has come to be recognized that ordinarily the lessee does not have as much knowledge of the condition of the premises as the lessor. Building code requirements and violations are known or made known to the lessor, not the lessee. He is in a better position to know of latent defects, structural and otherwise, in a building which might go unnoticed by a lessee who rarely has sufficient knowledge or expertise to see or to discover them. A prospective lessee, such as a small businessman, cannot be expected to know if the plumbing or wiring systems are adequate or conform to local codes. Nor should he be expected to hire experts to advise him. Ordinarily all this information should be considered readily available to the lessor who in turn can inform the prospective lessee. These factors have produced persuasive arguments for reevaluation of the *caveat emptor* doctrine and, for imposition of an implied warranty that the premises are suitable for the leased purposes and conform to local codes and zoning laws. Proponents of more liberal treatment of tenants say, among other things, that if a lease is a demise of land and a sale of an interest in land in the commercial sense, more realistic consideration should be given to the contractual nature of the relationship. See Skillern, "Implied Warranties in Leases: The Need for Change," 44 *Den L. J.* 387 (1967); 2 *Prospectus,* "Michigan Landlord—Tenant Law: Course of Statutory Reform," 225, 233 (1968); Schoshinski, "Remedies of the Indigent Tenant: Proposal For Change," 54 *Geo. L. J.* 519 (1966); Note, 21 *Vand. L. Rev.* 1117 (1968); 23 *Halsbury's Laws of England* (3d ed. 1958), *Landlord and*

*Tenant* § 1250, *p.* 575; and see *Hyland v. Parkside In-vestment Co., Inc.,* 10 *N. J. Misc.* 1148 (*Sup. Ct.* 1932); *Pines v. Perssion,* 14 *Wis.* 2d 590, 111 *N. W.* 2d 409 (1961); and compare, *Schipper v. Levitt & Sons, Inc.,* 44 *N. J.* 70 (1965). It will not be necessary to deal at any length with the suggested need for reevaluation and revision of the doc-trines of *caveat emptor* and implied warranties in leases beyond consideration of matters projected into the case by the various contentions of the landlord.

 Since the language of the two leases is the same, except that the second one describes the larger portion of the basement taken by the tenant, evaluation of the landlord's contentions will be facilitated by first considering the original lease and the factual setting attending its execution. Al-though the second or substitutionary lease is the controlling instrument, we take this approach in order to focus more clearly upon the effect of the change in the factual setting when the second lease was executed. This course brings us immediately to the landlord's reliance upon the provisions of the first lease (which also appear in the second) that the tenant inspected the "demised premises," accepted them in their "present condition" and agreed to keep them in good condition. The word "premises," construed most favorably to the tenant, means so much of the ground floor as was leased to Mrs. Cooper for commercial offices. The driveway or its surfacing or the exterior wall or foundation under it cannot be considered included as part of the "premises." In any event there is nothing to show that the inspection by Mrs. Cooper of the driveway or the ground floor exterior wall and foundation under it prior to the execution of the first lease would have given or did give her notice that they were so defective as to permit rainwater to flood into the leased portion of the interior. The condition should have been and probably was known to the lessor. If known, there was a duty to disclose it to the prospective tenant. Certainly as to Mrs. Cooper, it was a latent defect, and it would be a wholly inequitable application of *caveat emptor*

to charge her with knowledge of it. The attempted reliance upon the agreement of the tenant in both leases to keep the "demised premises" in repair furnishes no support for the landlord's position. The driveway, exterior ground floor wall and foundation are not part of the demised premises. Latent defects in this context, *i. e.,* those the existence and significance of which are not reasonably apparent to the ordinary prospective tenant, certainly were not assumed by Mrs. Cooper. In fact in our judgment present day demands of fair treatment for tenants with respect to latent defects remediable by the landlord, either within the demised premises or outside the demised premises, require imposition on him of an implied warranty against such defects. See *Buckner v. Azulai,* 251 *Cal. App. 2d Supp.* 1013, 59 *Cal. Rptr.* 806 (1967); *Charles E. Burt, Inc. v. Seven Grand Corporation,* 340 *Mass.* 124, 163 *N. E. 2d* 4, 6, n. 2 (1959); *Pines v. Perssion, supra,* 111 *N. W. 2d,* at 412–413. Such warranty might be described as a limited warranty of habitability. In any event we need not at this point deal with the scope of the warranty, nor with issues of public policy that might be involved in certain types of cases where express exclusion of such warranty is contained in the lease. *Cf. Henningsen v. Bloomfield Motors, Inc.,* 32 *N. J.* 358, 396–404 (1960); *Michaels v. Brookchesler, Inc., supra,* 26 *N. J.,* at 382–387; Uniform Commercial Code, *N. J. S.* 12A :2–302.

In *Pines v. Perssion, supra,* the Supreme Court of Wisconsin after noting that the frame of reference in which the old common law rule operated has undergone a change, declared:

"Legislation and administrative rules, such as the safeplace statute, building codes and health regulations, all impose certain duties on a property owner with respect to the condition of his premises. Thus, the legislature has made a policy judgment — that it is socially (and politically) desirable to impose these duties on a property owner — which has rendered the old common law rule obsolete. To follow the old rule of no implied warranty of habitability of leases would, in our opinion, be inconsistent with the current legislative

policy concerning housing standards. The need and social desirability of adequate housing for people in this era of rapid population increases is too important to be rebuffed by that obnoxious legal cliche, *caveat emptor*." 111 N. W. 2d at 412–413.

The letting of a one-family home to college students was involved in the case. Although the young men had gone through the house before renting it, the court pointed out they had no way of knowing that the plumbing, heating and wiring systems were defective. Under the circumstances an implied warranty of habitability was said to exist, and its breach by the landlord relieved the tenants of liability for rent, except for such rent as would be reasonable for the one month of their occupancy. See also, *Buckner v. Azulai, supra.* Similarly we believe that at the inception of the original lease in the present case, an implied warranty against latent defects existed.

But the landlord says that whatever the factual and legal situation may have been when the original lease was made, the relationship underwent a change to its advantage when the second was executed. This contention is based upon the undisputed fact that in April 1959, after a year of occupancy, defendant, with knowledge that the premises were subject to recurrent flooding, accepted a new lease containing the same provisions as the first one. This acceptance, the argument runs, eliminates any possible reliance upon a covenant or warranty of fitness because the premises were truly taken then "as is." While it is true that a tenant's knowing acceptance of a defective leasehold would normally preclude reliance upon any implied warranties, the landlord's position here is not sustainable because it is asserted in disregard of certain vital facts — the agent's promise to remedy the condition and the existence of an express covenant of quiet enjoyment in the lease.

The evidence is clear that prior to execution of the substitutionary lease, the tenant complained to the owner's agent about the incursion of water whenever it rained. The agent conceded the problem existed and promised to remedy

the condition. Relying upon the promise Mrs. Cooper accepted the new lease, and the landlord resurfaced the driveway. Unfortunately, either the work was not sufficiently extensive or it was not done properly because at some unstated time thereafter the water continued to come into the tenant's offices. The complaints about it resumed, and as noted above, until the building manager died he made prompt efforts to remove the water. In our opinion the tenant was entitled to rely upon the promise of its agent to provide a remedy. Thus it cannot be said as a matter of law that by taking the second lease she accepted the premises in their defective condition. See *Johansen v. Arizona Hotel, Inc.*, 37 *Ariz*. 166, 291 *P*. 1005 (1930); *Lynder v. S. S. Kresge Co.*, 329 *Mich*. 359, 45 *N. W*. 2d 319, 28 *A. L. R*. 2d 440 (1951); *Hancock Construction Co. v. Bassinger*, 198 *N. Y. S*. 614 (*Sup. Ct*. 1923).

This brings us to the crucial question whether the landlord was guilty of a breach of a covenant which justified the tenant's removal from the premises on December 30, 1961. We are satisfied there was such a breach.

The great weight of authority throughout the country is to the effect that ordinarily a covenant of quiet enjoyment is implied in a lease. 1 *American Law of Property, supra*, § 3.47, *pp*. 271–272; *Powell on Real Property, supra*, ¶ 225[3], *pp*. 232–240; Annotation, 41 *A. L. R*. 2d 1414, 1420 (1955). The early New Jersey cases laid down the strict rule that such a covenant would not be implied simply from the relationship of landlord and tenant. An express agreement to that effect or the use of words from which it could be implied was required. *May v. Levy*, 88 *N. J. L*. 351, 353 (*E. & A*. 1915) . We need not deal here with problems of current serviceability of that rule because as has been indicated above, the lease in question contains an express covenant of quiet enjoyment for the term fixed. Where there is such a covenant, whether express or implied, and it is breached substantially by the landlord, the courts have applied the doctrine of constructive eviction as a remedy for the tenant.

Under this rule any act or omission of the landlord or of anyone who acts under authority or legal right from the landlord, or of someone having superior title to that of the landlord, which renders the premises substantially unsuitable for the purpose for which they are leased, or which seriously interferes with the beneficial enjoyment of the premises, is a breach of the covenant of quiet enjoyment and constitutes a constructive eviction of the tenant. *Burnstine v. Margulies,* 18 *N. J. Super.* 259, 268 (*App. Div.* 1952); *Higgins v. Whiting,* 102 *N. J. L.* 279 (*Sup. Ct.* 1926); *McCurdy v. Wyckoff,* 73 *N. J. L.* 368 (*Sup. Ct.* 1906); *Weiler v. Pancoast,* 71 *N. J. L.* 414 (*Sup. Ct.* 1904); *Groh v. Kover's Bull Pen, Inc.,* 221 *Cal. App. 2d* 611, 34 *Cal. Rptr.* 637 (*D. Ct. App.* 1963); *Charles E. Burt, Inc. v. Seven Grand Corporation,* 340 *Mass.* 124, 163 *N. E. 2d* 4 (1959); *Westland Housing Corp. v. Scott,* 312 *Mass.* 375, 44 *N. E. 2d* 959 (1942); *Shindler v. Grove Hall Kosher Delicatessen & Lunch,* 282 *Mass.* 32, 184 *N. E.* 673 (1933); *Richker v. Georgandis,* 323 *S. W. 2d* 90 (*Tex. Civ. App.* 1959); *Ingram v. Fred,* 210 *S. W.* 298 (*Tex. Civ. App.* 1918); *Washington Chocolate Co. v. Kent,* 28 *Wash. 2d* 448, 183 *P. 2d* 514 (1947); *Bruckner v. Helfaer,* 197 *Wis.* 582, 222 *N. W.* 790 (1929); 1 *American Law of Property, supra,* § 3.51, *pp.* 280–282; 6 *Williston on Contracts* (3d ed. 1962) § 892, *pp.* 646–660.

Examples of constructive eviction having close analogy to the present case are easily found. Failure to supply heat as covenanted in the lease so that the apartment was "unlivable" on cold days amounted to constructive eviction. *Higgins v. Whiting, supra; Anderson v. Walker Realty Co.,* 1 *N. J. Misc.* 287 (*Sup. Ct.* 1923). So too, when the main waste pipe of an apartment building was permitted to become and remain clogged with sewage for a long period of time causing offensive odors and danger to health, the covenant of quiet enjoyment was breached and justified the tenant's abandonment of his premises. *McCurdy v. Wyckoff, supra.* If a landlord lets an apartment in his building to a tenant as a

dwelling and knowingly permits another part to be used for lewd purposes which use renders the tenant's premises "unfit for occupancy by a respectable family," his failure to terminate the use when he has the legal power to do so constitutes a constructive eviction. *Weiler v. Pancoast, supra.* The same rule was applied in *White v. Hannon,* 11 *N. J. L. J.* 338 (*Dist. Ct.* 1888) where it appeared that the plumbing in the rooms to the rear of the demised premises became so old and worn out as to emit strong and unhealthy odors which came through into the tenant's quarters. The tenant's removal was held justified. And see *Gibbons v. Hoefeld,* 299 *Ill.* 455, 132 *N. E.* 425 (1921) ; *Westland Housing Corp. v. Scott, supra; Shindler v. Grove Hall Kosher Delicatessen & Lunch, supra; Everson v. Albert,* 261 *Mich.* 182, 246 *N. W.* 88 (1933) ; *Rea v. Algren,* 104 *Minn.* 316, 116 *N. W.* 580, 581 (1908) ; *Wood v. Gabler,* 229 *Mo. App.* 1188, 70 *S. W. 2d* 110 (1934) ; *Sewell v. Hukill,* 138 *Mont.* 242, 356 *P. 2d* 39 (1960) ; *Barnard Realty Co. v. Bonwit,* 155 *App. Div.* 182, 139 *N. Y. S.* 1050 (1913) ; *Moe v. Sprankle,* 32 *Tenn. App.* 33, 221 *S. W. 2d* 712 (1948) ; 6 *Williston on Contracts, supra,* § 892, *pp.* 653–658.

As noted above, the trial court found sufficient interference with the use and enjoyment of the leased premises to justify the tenant's departure and to relieve her from the obligation to pay further rent. In our view the evidence was sufficient to warrant that conclusion, and the Appellate Division erred in reversing it. Plaintiff argued and the Appellate Division agreed that a constructive eviction cannot arise unless the condition interferes with the use in a permanent sense. It is true that the word "permanent" appears in many of the early cases. See *e. g., Stewart v. Childs Co.,* 86 *N. J. L.* 648, 650 (*E. & A.* 1914). But it is equally obvious that permanent does not signify that water in a basement in a case like this one must be an everlasting and unending condition. If its recurrence follows regularly upon rainstorms and is sufficiently serious in extent to

amount to a substantial interference with use and enjoyment of the premises for the purpose of the lease, the test for constructive eviction has been met. Additionally in our case, the defective condition of the driveway, exterior and foundation walls which permitted the recurrent flooding was obviously permanent in the sense that it would continue and probably worsen if not remedied. There was no obligation on the tenant to remedy it.

Plaintiff claims further that *Stewart v. Childs Co., supra,* strongly supports its right to recovery. Under the lease in that case the landlord covenanted that at all times he would keep the cellar waterproof. The cellar was known to be necessary to the conduct of the tenant's business. After the business opened, water flooded into the cellar, at times to a depth of two and three feet. There was no doubt the flooding resulted from failure of the landlord to make the place waterproof. But when the tenant moved out, a suit for rent for the unexpired term was instituted and the landlord was allowed to recover. It was held that the agreement to pay rent and the agreement to waterproof the cellar were independent covenants and breach of the covenant to waterproof was not a defense to the action for rent. We regard this holding as basically contrary to that in *Higgins v. Whiting, supra,* where the agreement by the landlord to heat the leased premises and the tenant's agreement to pay rent during the term were declared to be mutually dependent covenants. Thus failure to heat constituted a failure of consideration and justified vacation by the tenant without liability for further rent. We reject the rule of *Stewart v. Childs Co.* and espouse *Higgins v. Whiting* as propounding the sounder doctrine. And see *Groh v. Kover's Bull Pen, Inc., supra,* 221 *Cal. App.* 2d 611, 34 *Cal. Rptr.,* at 639; *Westland Housing Corp. v. Scott, supra; Stifter v. Hartman,* 225 *Mich.* 101, 195 *N. W.* 673 (1923); *Ingram v. Fred, supra;* 39 *Harv. L. Rev.* 1102 (1926). *Higgins v. Whiting* is compatible with the sensible approach taken in *Pines v.*

*Perssion, supra,* where in addition to the excerpt quoted above, the court said:

"The evidence clearly showed that the implied warranty of habitability was breached. Respondents' covenant to pay rent and appellant's covenant to provide a habitable house were mutually dependent, and thus a breach of the latter by appellant relieved respondents of any liability under the former." 111 *N. W.* 2d at 413.

Breach of the implied warranty of habitability was held to constitute failure of consideration on the part of the landlord.

Similarly whether the landlord's default in the present case is treated as a substantial breach of the express covenant of quiet enjoyment resulting in a constructive eviction of the tenant or as a material failure of consideration, (*i. e.,* such failure as amounts to a substantial interference with the beneficial enjoyment of the premises) the tenant's vacation was legal. Thus it is apparent from our discussion that a tenant's right to vacate leased premises is the same from a doctrinal standpoint whether treated as stemming from breach of a covenant of quiet enjoyment or from breach of any other dependent covenant. Both breaches constitute failure of consideration. The inference to be drawn from the cases is that the remedy of constructive eviction probably evolved from a desire by the courts to relieve the tenant from the harsh burden imposed by common law rules which applied principles of *caveat emptor* to the letting, rejected an implied warranty of habitability, and ordinarily treated undertakings of the landlord in a lease as independent covenants. To alleviate the tenant's burden, the courts broadened the scope of the long-recognized implied covenant of quiet enjoyment (apparently designed originally to protect the tenant against ouster by a title superior to that of his lessor) to include the right of the tenant to have the beneficial enjoyment and use of the premises for the agreed term. It was but a short step then to the rule that when the landlord or someone acting for him or by virtue of a right ac-

quired through him causes a substantial· interference with that enjoyment and use, the tenant may claim a constructive eviction. In our view, therefore, at the present time whenever a tenant's right to vacate leased premises comes into existence because he is deprived of their beneficial enjoyment and use on account of acts chargeable to the landlord, it is immaterial whether the right is expressed in terms of breach of a covenant of quiet enjoyment, or material failure of consideration, or material breach of an implied warranty against latent defects.

Plaintiff's final claim is that assuming the tenant was exposed to a constructive eviction, she waived it by remaining on the premises for an unreasonable period of time thereafter. The general rule is, of course, that a tenant's right to claim a constructive eviction will be lost if he does not vacate the premises within a reasonable time after the right comes into existence. *Weiss v. I. Zapinsky, Inc.*, 65 *N. J. Super.* 351 (*App. Div.* 1961); *Duncan Development Co. v. Duncan Hardware, Inc.*, 34 *N. J. Super.* 293 (*App. Div.* 1955); 1 *American Law of Property, supra*, § 3.51, p. 282. What constitutes a reasonable time depends upon the circumstances of each case. In considering the problem courts must be sympathetic toward the tenant's plight. Vacation of the premises is a drastic course and must be taken at his peril. If he vacates, and it is held at a later time in a suit for rent for the unexpired term that the landlord's course of action did not reach the dimensions of constructive eviction, a substantial liability may be imposed upon him. That risk and the practical inconvenience and difficulties attendant upon finding and moving to suitable quarters counsel caution.

Here, plaintiff's cooperative building manager died about nine months before the removal. During that period the tenant complained, patiently waited, hoped for relief from the landlord, and tried to take care of the water problem that accompanied the recurring rainstorms. But when relief did not come and the "crowning blow" put five inches of

water in the leased offices and meeting rooms on December 20, 1961, the tolerance ended and the vacation came ten days later after notice to the landlord. The trial court found as a fact that under the circumstances such vacation was within a reasonable time, and the delay was not sufficient to establish a waiver of the constructive eviction. We find adequate evidence to support the conclusion and are of the view that the Appellate Division should not have reversed it. See *Groh v. Kover's Bull Pen, Inc., supra; Ackerhalt v. Smith*, 141 *A. 2d* 187, 189 (*Mun. Ct. App. D. C.* 1958); *Gibbons v. Hoefeld, supra; Cox v. Hardy*, 371 *S. W. 2d* 945 (*Ct. App. Ky.* 1963); *Sewell v. Hukill, supra; Kennedy v. Nelson*, 76 *N. M.* 299, 414 *P. 2d* 518 (1966); *Richker v. Georgandis, supra.*[1]

For the reasons expressed above, we hold the view that the trial court was correct in deciding that defendant had been constructively evicted from the premises in question, and therefore was not liable for the rent claimed. Accordingly,

---

[1] Although not necessary to our decision, we note that the New York Supreme Court, Appellate Division, in *E. Esarsee, Inc. v. Holland*, 241 *App. Div.* 736, 269 *N. Y. S.* 745 (1934) held that where the condition which caused the constructive eviction, *i. e.,* lack of waterproof exterior walls, was a continuing one, the basis for right to vacate was renewed after each monthly payment of rent.

Also, it is worthy of note that in recent times some courts, recognizing the position of a tenant who claiming constructive eviction moves out before the end of his term, have attempted to neutralize the hazard by authorizing equitable relief. For example in *Charles E. Burt, Inc. v. Seven Grand Corporation, supra,* such a tenant was allowed to move in equity to restrain the collection of further rents under the lease, and for recission of the lease as well as a declaration of nullity. 163 *N. E. 2d* at 7. The court indicated further that if the tenant remained in possession until the successful disposition of the action, his liability for intervening rent would be limited to the difference between the lease-fixed rent and the reasonable rental value of the premises in their defective condition. 163 *N. E. 2d* at 8. So too in *Pines v. Perssion, supra,* the Wisconsin Supreme Court held that since "there was a [material] failure of consideration, respondents [lessees] are absolved from any liability for rent under the lease and their only liability is for the reasonable rental value of the premises during the time of actual occupancy." 111 *N. W. 2d* at 413. In this connection a further application of

the judgment of the Appellate Division is reversed and that of the trial court is reinstated.

*For reversal* — Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN — 7.

*For affirmance* — None.

equitable principles may be worthy of consideration. Where the facts warrant the conclusion that the landlord has breached any dependent covenant of the lease (for example, that of quiet enjoyment) or an implied warranty against latent defects in such manner as to warrant vacation of the premises by the tenant but the tenant is willing to remain in possession and pay a sum representing their reasonable rental value in their defective or reduced-value condition, should he not be entitled to do so for the remainder of the term and to have the court fix the reasonable rental value for that period, or in the alternative have the defective condition repaired or remedied himself and offset the cost against the rent fixed in the lease, provided the expenditure involved would not be unreasonable in light of the value of the leasehold?