**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1213-22

KVPR, LLC,

      Plaintiff-Appellant/
      Cross-Respondent,

v.

30-38 OAK STREET, LLC,

      Defendant-Respondent/
      Cross-Appellant,

and

ONYX EQUITIES, LLC,

      Defendant-Respondent.

_____

30-38 OAK STREET, LLC,

      Third-Party Plaintiff-
      Respondent/Cross-Appellant,

v.

MICHAEL PICKHOLZ,

      Third-Party Defendant-

Appellant/Cross-Respondent.

_____

Submitted April 16, 2024 – Decided July 18, 2025

Before Judges Gooden Brown and Bergman.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Docket No. L-7147-16.

Lawrence H. Kleiner, LLC, attorneys for appellants/cross-respondents (Lawrence H. Kleiner, of counsel and on the briefs).

Cole Schotz, PC, attorneys for respondent Onyx Equities, LLC, and respondent/cross-appellant 30-38 Oak Street, LLC (Adam J. Sklar and Eric S. Latzer, of counsel and on the briefs).

The opinion of the court was delivered by

GOODEN BROWN, P.J.A.D.

Plaintiff KVPR, LLC (KVPR) appeals from a final judgment entered on November 15, 2022, dismissing its claims after a bench trial. The claims arose from plaintiff's commercial lease agreement with 30-38 Oak Street, LLC (Oak Street), and Onyx Equities, LLC (Onyx), collectively defendants. The crux of the dispute involved plaintiff's allegations of breach of contract and fraud stemming from flooding incidents that occurred at the leased premises. Oak Street cross-appeals from the same judgment dismissing its claims in its counterclaim against plaintiff for breach of the lease terms and dismissing its

2                                                                    A-1213-22

third-party complaint against third-party defendant Michael Pickholz, plaintiff's principal and personal guarantor. Based on our review of the record and applicable legal principles, we affirm the trial court's dismissal of plaintiff's claims, reverse the dismissal of Oak Street's counterclaim and third-party complaint, and remand for further proceedings consistent with this opinion.

I.

We glean the salient facts from the five-day bench trial conducted on consecutive days in October 2022.

In March 2014, the parties entered into a lease agreement wherein plaintiff would rent from defendants a portion of property located at 30-38 Oak Street in Ridgewood (the property or the premises). Pickholz, plaintiff's principal, planned to open a Kidville Inc. franchise, an early childhood enrichment center attended by preschoolers and toddlers. Kidville offered development classes, creative activities, and services such as music, art, dance, and gymnastic classes. Kidville members would attend classes with their parents and would watch videos, crawl on the floor, play games, and sing songs.

Pickholz's desire to open a Kidville franchise stemmed from his own children's attendance at the flagship location in New York City. Pickholz wanted to provide "high-end quality" classes by using an Olympic-rated gym

with padded floors and equipment; music classes from a live, four-piece band with proprietary Muppet characters; and a dance studio with parquet floors, spotlights, and mirrored walls. Pickholz believed he was "absolutely" qualified to run a Kidville franchise due to his significant background in business, which included over twenty years' of overseeing and advising businesses, sitting on boards, and managing startups. His career included asset management and private equity banking. He received a BA in history from Colgate University and a master's in accounting and "dual MBA in finance and accounting" from New York University.

On June 12, 2013, Pickholz established plaintiff as a corporate entity to own and operate the selected Kidville franchise location and issued a check in the amount of $50,000 to Kidville Franchise Company, LLC. In selecting a building for his Kidville franchise, Pickholz sought a space in "a good central location that was easily reachable" and had ample parking, "nice aesthetics," and a minimum of about 4,000 square feet of space. Pickholz was in the process of negotiating a lease on another building when he was contacted by Adam Karafiol, senior vice president of leasing at Onyx, the property manager of Oak Street, and asked to consider the Oak Street property.

A-1213-22

The Oak Street property had two above-ground stories and a basement. Other tenants included Park West Tavern (the Tavern), a ground-floor restaurant; Park West Loft, a private event space; the Old Post Office, a historic building; Savvy Chic, a clothing store; and Neil Diamonds Fine Jewelers (Neil Diamonds), a jewelry store. The property also had a common lobby area, small offices, and common bathrooms. Pickholz expressed interest in taking over the Old Post Office space, the back half of Park West Loft, Savvy Chic, and the basement.

In the fall of 2013, Pickholz and Karafiol inspected the property together. At trial, Pickholz testified he saw "a small water puddle on the floor," "probably around, plus or minus," the size of a manhole. Pickholz testified that he asked Karafiol about "the puddle."

> He said that, oh, it's no big deal. He said, you know, [the Tavern] is above this, and at the time, . . . I think they're working there. He said that [the Tavern] had just installed or replaced some equipment and that—if I didn't realize at the time, we were standing roughly around where the kitchen is.
>
> And so, when they did that—with large commercial equipment, you know, you have the big plumbing lines or whatever that go through, and you have to cut. So obviously, that caused some water and whatever that spilled on the floor. And that's what caused some of it. Obviously, it came down, and since the pipes are right there, . . . it dripped, so they opened

5

it up. And once the new equipment was put in, obviously, it was, you know, sealed off, and there[ were] no issues. And so, it was just open from a little bit of the water that had come in and, you know, would all be dried out or whatever in a couple of days, and they'd replace the tile.

Pickholz testified the explanation "seemed to be" satisfactory because the puddle "looked like something that would make total sense if a refrigerator or a pipe from a sink had opened." Pickholz also testified that he discussed the property with Randy Carson, who owned the Tavern and "helped basically sell [him]" on the property. He testified that Carson informed him "he hadn't had any issues involved with his space."

Karafiol testified that when he and Pickholz inspected the premises for the first time, they noticed stained ceiling tiles in the basement. He recalled explaining to Pickholz that the Tavern's kitchen or a faulty HVAC system could have caused the stains, but he did not know for sure. He also recalled that it was not an active leak, so he felt no follow-up was necessary. Karafiol further testified he and Pickholz observed a sump pump in a basement closet, which he said was there "because the water table [was] high."

Karafiol did not recall any further discussions about plumbing or water issues in the property. He did not recall seeing a puddle on the floor or Pickholz ever asking or following up about a puddle. He also testified that when the pair

6

met again in November 2013, they discussed the sump pump in the basement. Additionally, contrary to Pickholz's testimony, Karafiol did not recall discussing Hurricane Sandy or any prior flooding in connection with the storm.

In March 2014, Oak Street and plaintiff executed a lease agreement for "[a]pproximately 6,000 gross rentable square feet, a portion of which is on the ground floor level and a portion of which is on the lower level floor" of 30-38 Oak Street. The lease permitted use of the space for "[i]ntegrated children services for children and their parents, including, but not limited to, offering children[-]oriented development classes, creative activities and services[,] including music, dance, gymnastics, parties, a retail store, salon and other related services." Pickholz did not retain counsel to review the lease, but his brother, a lawyer, reviewed and discussed it with him.

The ten-year lease required annual rent of $153,000 for the first year, with a three-percent increase on the first day of each new lease year, and a security deposit of $25,000. Although Karafiol testified he did not believe the security deposit was ever paid, Pickholz recalled paying the deposit "eventually" in May or June of 2015. The lease assigned defendants the responsibility for repairs "to the roof, foundation and exterior walls of the [b]uilding and any load[-]bearing interior walls of the [p]remises, and all components of the electrical, mechanical,

7

and plumbing systems and facilities located on [p]roperty [that] are used in common by tenants of the [b]uilding." However, under the lease terms, if such repairs were necessitated by plaintiff's actions, plaintiff would bear the cost of the repairs.

In the lease, Oak Street expressly represented that

> [t]he elevators, electrical system, plumbing system, fire prevention system, roofs, foundations and all structural components of the [b]uilding are in working order and conditions, are fit for their intended purposes, and, subject to the provisions of this [l]ease, will be maintained in working order and condition by [Onyx] throughout the term of the [l]ease.

When executing the lease, Pickholz also signed a personal guaranty, where he unconditionally guaranteed:

> (i) subject to the next two sentences, the full and faithful timely payment of all amounts, no matter how designated, due pursuant to the [l]ease, expressly including, without being limited to, the timely payment of [b]asic [r]ent and [a]dditional [r]ent, and (ii) the timely performance of all the terms, covenants and conditions of the [l]ease to be performed by [plaintiff], expressly including, without being limited to, [plaintiff]'s obligations to comply with environmental laws. Notwithstanding the prior sentence, the obligation of [Pickholz] hereunder is limited to [$50,000].

Before plaintiff took possession of the property, Onyx agreed to perform certain work at its own cost, including demising the basement portion,

8

restructuring an internal stairwell, removing a safe on the ground floor, and constructing new bathrooms so that existing bathrooms would be exclusively for Kidville and its clients. While the work was completed, the agreement provided for a rent abatement for the first six months of the lease at a monthly rate of $12,750.

Initially, Pickholz wanted to open Kidville in September 2014 so the opening would coincide "with the school calendar." Onyx was scheduled to complete its work "by late spring, early summer," and plaintiff would begin its construction soon after. However, due to construction delays, Kidville's grand opening was delayed and rescheduled for January 2015. In the interim, Pickholz obtained equipment and furniture for the business, hired staff, started marketing campaigns, offered tours, and began signing up members in a "soft opening."

Pickholz planned to have Kidville's grand opening on January 10, 2015. However, his plan was derailed when, according to Pickholz, "two-thirds plus of the facility was destroyed" in the first flooding incident. In a January 13, 2015 email to Rammy Harwood, CEO of Kidville, Pickholz described the incident, stating that the Tavern "left [the service] door to [the] building open Saturday night. Sprinklers froze and exploded. Water destroyed the theater and some of the floors. All being redone by tomorrow. Have [fifty] guys working

round the clock." Pickholz further described the damage in his trial testimony, stating that "the entire theater space was destroyed" and "every[thing] had to be stripped back to the studs . . . from the carpet, the walls, the ceiling tiles, [and] some of the equipment." The flood also destroyed customized carpeting, puppets, musical equipment, a stage, curtains, and other inventory.

Once the repairs were made and the damage remediated, Kidville had its grand opening on January 15, 2015, five days after its scheduled date. Although Pickholz testified that "the [grand opening] party went well," he called the actual opening and start of classes "somewhat of a disaster." He explained that because staff did not have sufficient time to follow up with clients or prospective clients to confirm class sign-ups and start dates, parents wanted to delay starting classes and asked for discounts. Pickholz characterized the opening of the business as "tough but sort of as expected," in part because they missed "the optimal time to open . . . in September."

In August 2015, plaintiff filed an insurance claim with its insurer in connection with the January 2015 flooding incident and received a check for about $38,000, which Pickholz paid to Onyx. Initially, Pickholz testified that he used the insurance proceeds to repay "Onyx for what they repaired." Later,

10

he testified that he "thought [the money] was supposed to be applied to" pay three months' rent.

In September 2015, a second water incident occurred. Pickholz testified that he "personally observed brown sewage, rotting food and fecal matter coming out of the drains that were connected to the main black iron sewage lines for the building, in the common areas downstairs, and essentially flowing out over the entire downstairs, under doors." Although Onyx repaired and cleaned the area by the next day, Pickholz recalled Kidville could not hold classes for a week or more "because not only was it wet but it smelled like a toilet." Pickholz was not aware if Onyx performed any plumbing work in addition to the clean-up at that time.

The second incident damaged some musical equipment, puppets, carpet tiles, and a custom-painted wall mural. Kidville also had to replace three or four employees. Pickholz testified that he gave refunds, discounts, or credits for free products or equipment to clients affected by the cancellation of classes, but he did not provide any supporting documentation at trial. Pickholz also stated that Kidville had to turn down some birthday parties because they did not know "whether it was gonna be a few days or a month or what was happening" in terms of reopening. In fact, most of Kidville was operational again a week later.

Although Pickholz did not expend any money on repairs, he replaced the damaged items and the mural. Pickholz did not file an insurance claim after the second incident.

In October 2015, a third flooding incident occurred. Pickholz believed the flood stemmed from a blocked sewer line, flooding most of the downstairs facility with sewage. He recalled that his office "smelled like a sewer and when [he] went to walk through the door to the kitchen, there was brown sewage spreading across the floors." Pickholz notified Onyx, who sent workers to repair and clean the damage. The repairs and cleanup were completed within a couple of days, but Kidville remained closed for a few additional days so the affected areas could dry completely. Pickholz did not file an insurance claim after the third incident either.

In March 2016, a fourth incident occurred. According to Pickholz, one of Kidville's music courses ended early due to "brown sludge just pouring out from the walls, going straight across the floors in the back of the facility." Pickholz immediately notified Onyx, who sent workers to cut the drywall between Kidville and Neil Diamonds to repair the "degraded sewer pipe with fecal matter pouring down the floor and flowing into the facility." After observing

12

discoloration on the walls, Pickholz expressed concern about mold but a laboratory mold analysis, paid for by Onyx, found no fungi.

Onyx's assistant property manager, Nicole Vasquez, testified that the Tavern was performing plumbing and maintenance at the time, which defendants believed caused the leak. Onyx called its remediation company to clean the carpet tile, open the walls for cleanup, close the walls back up, and repaint. Onyx also agreed to cover the cost of repainting the destroyed mural on the wall. This repair and cleanup took over a week, and Kidville could not conduct classes for about another week. Vasquez recalled that Pickholz told her "it was okay, he had no classes scheduled in that space for those next few days."

The final incident occurred on May 31, 2016. One of Pickholz's managers called to tell him the toilets were clogged. When Pickholz arrived, he was "about half to knee deep in what looked like a fecal river." Keith Schlachter, the building maintenance manager, also arrived. According to Pickholz,

> there was not a flood, it literally was a river, like we were standing in a flowing current. You could see, and we walked through the current, back up the hallway into the theater, and over to the closet door that backed up to the wall I guess that the staircase ran up, and saw that that's where it seemed to be coming [from].
>
> Keith opened the door and you could see the current literally looked like it was . . . a ghost going through the wall and the current was starting at the wall

A-1213-22

and just flowing forward at which point Keith pointed over to the wall[,] and there was clearly a wet spot in the wall that was . . . going up kind of like a cone shape, higher than where the flood had reached at that point, and said, "It's got to be here." He . . . basically just punched his hand in the wall and tore the drywall out, and there was a pipe that was coming out on a right angle, just open and spewing like a fire hydrant this fecal matter.

Plaintiff provided video evidence of the broken pipe and presented pictures of the aftermath of the flood. The next day, Onyx and a Ridgewood health official ordered everyone out of the building "to determine whether or not there was mold or [any] other health contaminant." Pickholz was allowed into the upstairs portion of the building a few days later.

Vasquez testified that she informed Pickholz the final leak appeared to be caused by "a backup in the main line that caused a capped pipe to break and start leaking." According to Vasquez, Ridgewood health officials ultimately decided "Kidville should close down until all of the cleanup was done," and they returned to conduct a final inspection and "give the green light" for reopening. Vasquez testified that Ridgewood required Kidville to remain closed for "approximately two to three weeks." During this period, Vasquez recalled that "walls . . . were opened. There were carpet tiles that were removed. There was drying of the space. There was mold testing. Any cleanup required for that was done, and

14

then we closed up all the walls, reinstalled all the carpet tile, [and] painted everything back to its original condition."

Vasquez further testified Kidville was allowed to reopen on or around June 21, 2016, upon completion of the repairs. Vasquez did not recall Pickholz telling her he could not reopen because more work was needed or that the repairs were not satisfactory. She testified that "[m]onths went by" before she found out that Pickholz would not reopen Kidville.

Pickholz confirmed that during the clean-up, Onyx removed all the damaged and soiled items from Kidville, including furniture, toys, and puppets, and that he created an itemized list of property lost in this flood to submit to the insurance company, totaling $56,711.11. Pickholz explained that Kidville did not reopen after this incident because "the facility was never fully repaired. We lost all of our employees, members, equipment, everything else, and . . . we were informed that our insurance was going to be cancelled at the end of the policy term[,] which would have been in the end of August." Pickholz testified that he left the upstairs portion of the building for good "in early August."

Plaintiff's insurance company sent a notice of non-renewal, dated June 22, 2016, advising that the policy would no longer be in effect after September 11, 2016. In a letter dated November 4, 2016, the insurer advised plaintiff it would

not pay for loss or damage caused by "[w]ater that backs up or overflows or is otherwise discharged from a sewer, drain, sump, sump pump or related equipment."

Marc Shavel, a gemologist for Neil Diamonds since 2009, testified for plaintiff.  He stated that his employer, Neil Diamonds, was a tenant of 38 Oak Street from 2009 to 2017.  Shavel recalled having "to close the showroom on several occasions when the sewage backed up into the basement," as well as "additional water problems coming from [the Tavern's] kitchen."  On occasion, Shavel and his co-workers would "walk through water and sewage to get to the office," which "smelled liked raw sewage."  He described this as a building-wide problem.

Shavel further recounted that the jewelry store was not responsible for cleanup and "if the water was not sewage related, only Onyx would clean.  If the water damage or the water flooding was more sewage, then Onyx would bring in a plumber."  He estimated a history of three to four sewage incidents and eight to ten other water problems.  He did not know the cause of any of the floods but recalled that Schlachter had previously mentioned clogged drains.

On July 18, 2016, plaintiff's counsel wrote to defendants, advising the multiple water incidents "severely disrupted [plaintiff's] business operations,"

16

and that the May 31, 2016 incident "rendered the [p]remises unusable" and "raised serious concerns over the exposure of [plaintiff's] employees and clients to biological and environmental hazards such that the Health Department intervened and forced [plaintiff] to close its facilities and, as a result, cease its business operations entirely." The letter demanded payment of $819,000.

In October 2016, plaintiff filed a complaint against Oak Street, alleging breach of contract and breach of the implied covenant of good faith and fair dealing based on Oak Street's "failure to adequately remedy and repair the recurrent flooding and leak issues plaguing the [p]remises." The complaint sought $819,000 in damages. In November 2016, plaintiff filed an amended complaint naming Onyx as a defendant and alleging fraud against Onyx. The fraud count sought damages based on Onyx knowingly making "false representations and omissions of material fact" to plaintiff "prior to execution of the [l]ease regarding the condition of the [p]remises" to induce plaintiff to enter into the lease and plaintiff relying on those misrepresentations in signing the lease.

In January 2017, defendants filed an answer with affirmative defenses, and Oak Street asserted a counterclaim against plaintiff and third-party complaint against Pickholz. The counterclaim alleged that plaintiff breached

the lease by failing to pay the outstanding rent. In the third-party complaint, Oak Street claimed Pickholz breached his personal guarantee by refusing to honor plaintiff's contractual obligations under the lease.

After discovery ended, defendants moved for summary judgment, asserting plaintiff's failure to retain an expert to opine on the property's plumbing system was fatal to its claims. The judge denied the motion and conducted a bench trial. When plaintiff rested, defendants moved for an involuntary dismissal under Rule 4:37-2(b), arguing the same points raised in their unsuccessful summary judgment motion. The judge denied the motion.

After closing arguments, the judge issued a final judgment on November 15, 2022. On the amended complaint, the judge entered judgment in favor of defendants, dismissing with prejudice plaintiff's claims against defendants. On Oak Street's counterclaim and third-party complaint, the judge entered judgment in favor of plaintiff and Pickholz, dismissing with prejudice all of Oak Street's claims. In an oral decision placed on the record on October 28, 2022, the judge reviewed in detail each witness's testimony, assessing its value and pointing out discrepancies. The judge also reviewed the terms of the lease, noting that there were "many exculpatory clauses in the lease that inure[d] to the benefit of the

landlord." Lastly, the judge addressed the causes of action, applying the governing legal principles.

Specifically, regarding the fraud count, the judge found Pickholz had not provided any evidence "of any affirmative misrepresentations or any omissions of material fact" by defendants. He found that "in entering into both the lease and the new business enterprise," Pickholz relied on his own extensive business background, "[o]ne of the more impressive business experience backgrounds . . . [the c]ourt ha[d] ever heard." According to the judge, Pickholz "conducted extensive due diligence before leasing the premises," and "there was no justifiable reliance" by plaintiff on any statement by defendants.

As to plaintiff's breach of contract claim, the judge found that defendants "did provide what was provided by the clear provisions of the lease."

> The lease provided that the premises were taken as is, that plumbing problems could occur, and they were not sufficient enough under the terms of the lease to warrant a default by . . . plaintiff on [its] obligations . . . . [Pickholz] had the quiet enjoyment of his premises. They were fit for the use that he intended. He did use them for those purposes. And there is no showing whatsoever that any of these problems with plumbing were a breach, or even a material breach, . . . as contemplated by the lease, and as such he cannot prove a breach of contract by the clear provisions of the lease.

19

The judge also stressed that other than the last flood, "we have nothing . . . documenting what happened."

Finally, the judge found that plaintiff was constructively evicted on May 31, 2016, the day of the last flood. In support, the judge explained:

> There is no doubt that . . . plaintiff['s] business could not open. It was by government order of . . . Ridgewood. . . . [T]hey did close the business down[] and said kids couldn't go there. And it was only three weeks that a certificate was then issued to be able to reoccupy it, but those three weeks obviously are critical in a kid care business[.] . . . [A]s such the [c]ourt does find constructive eviction occurring, so that . . . plaintiff no longer had any obligation to . . . defendant to pay further rent.

Because the judge found constructive eviction relieved plaintiff of the obligation to pay "any further rent from that period of time to the end of the lease," the judge concluded Oak Street could not prevail on its counterclaim and third-party complaint "for the [non]payment of rent." These appeals followed.

In its appeal, plaintiff raises the following points for our consideration:

POINT I

THE TRIAL COURT ERRED IN . . . FINDING THAT . . . DEFENDANT DID NOT COMMIT FRAUD IN PROCURING THE LEASE.

20

POINT II

THE TRIAL COURT ERRED IN NOT FINDING THAT . . . DEFENDANT BREACHED THE WARRANTY OF INTENDED USE FROM THE OUTSET OF THE LEASE TERM AND NOT AWARDING . . . PLAINTIFF DAMAGES.

In its cross-appeal, Oak Street raises the following argument for our consideration:

THE TRIAL COURT ERRED IN FINDING THAT [PLAINTIFF] WAS CONSTRUCTIVELY EVICTED FROM THE PREMISES FOLLOWING THE LAST WATER INCIDENT AND BY REFUSING TO AWARD OAK STREET PAST DUE RENT.

II.

Our review of a trial court's fact-finding in a non-jury trial is limited. Seidman v. Clifton Sav. Bank, S.L.A., 205 N.J. 150, 169 (2011). Our inquiry "ponders whether . . . there is substantial evidence in support of the trial judge's findings and conclusions." Sipko v. Koger, Inc., 214 N.J. 364, 376 (2013) (omission in original) (quoting Seidman, 205 N.J. at 169). Appellate courts do not disturb the factual findings of the trial judge unless convinced that "they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Tractenberg

v. Twp. of W. Orange, 416 N.J. Super. 354, 365 (App. Div. 2010) (quoting Rova Farms Resort, Inc. v. Invs. Ins. Co. of Am., 65 N.J. 474, 484 (1974)).

"Deference is especially appropriate when the evidence is largely testimonial and involves questions of credibility. Because a trial court hears the case, sees and observes the witnesses, and hears them testify, it has a better perspective than a reviewing court in evaluating the veracity of the witnesses." Seidman, 205 N.J. at 169 (quoting Cesare v. Cesare, 154 N.J. 394, 412 (1998)). Although we defer to the trial court in its factual findings, "[a] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

We now turn to plaintiff's causes of action. Plaintiff first argues the judge erred in finding Onyx did not fraudulently procure the lease because Onyx made material misrepresentations "that water issues did not exist on the premises." To establish a claim of common law fraud, a plaintiff must demonstrate: "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." Banco Popular N. Am. v. Gandi, 184 N.J. 161, 172-73 (2005)

(quoting Gennari v. Weichert Co. Realtors, 148 N.J. 582, 610 (1997)). Importantly, "fraud is never presumed." Weil v. Express Container Corp., 360 N.J. Super. 599, 613 (App. Div. 2003). Instead, a plaintiff "must prove each element by 'clear and convincing evidence.'" DepoLink Ct. Reporting & Litig. Support Servs. v. Rochman, 430 N.J. Super. 325, 336 (App. Div. 2013) (quoting Stochastic Decisions, Inc. v. DiDomenico, 236 N.J. Super. 388, 395 (App. Div. 1989)).

Applying these principles, the judge's finding that plaintiff did not sustain its burden of proof and failed to establish the elements of fraud is supported by the trial record, and we discern no basis to disturb the judge's findings. See Meshinsky v. Nichols Yacht Sales, Inc., 110 N.J. 464, 475 (1988) ("Trial court findings are ordinarily not disturbed unless 'they are so wholly unsupportable as to result in a denial of justice,' and are upheld wherever they are 'supported by adequate, substantial and credible evidence.'" (quoting Rova Farms, 65 N.J. at 483-84)). Critically, plaintiff did not show that defendants knowingly made false statements, misrepresentations, or omissions. Pickholz failed to provide any evidence that the property was unfit when he signed the lease and that defendants had knowledge of such unfitness when the parties entered the lease

agreement. As the judge pointed out, he had no documentation of complaints about the property.

Karafiol testified that he did not recall seeing a puddle of water on the floor while inspecting the premises with Pickholz or any conversations about past floods or Hurricane Sandy causing any water issues for the building. He recalled that both he and Pickholz noticed the stains on the ceiling, but Karafiol did not know what caused the stains. He surmised that they came from the Tavern's kitchen upstairs or the HVAC system, but Pickholz never followed up about the stains after that initial discussion. Karafiol also recalled discussing the sump pump during the inspection and testified that he told Pickholz it was there because the basement had a high water table. In the absence of a material misrepresentation, plaintiff cannot establish defendants' knowledge or belief of falsity.

Pickholz also failed to show detrimental reliance, since he relied on factors other than defendants' alleged statements in signing the lease. Although Pickholz did not hire counsel to review the lease, his brother, a lawyer, reviewed it with him. He also spoke with the owner of the Tavern and "relied upon [the owner's] statements" when signing the lease. The judge also found Pickholz relied on his own extensive skills and experience in business in entering into

24

both the lease and the new business enterprise, rather than any statements by defendants. Therefore, we are satisfied the judge's findings are supported by competent, relevant, and credible evidence in the record to justify dismissal of plaintiff's fraud claim.

We next turn to plaintiff's breach of contract claim. Plaintiff argues the judge erred in not finding Oak Street breached the warranty of intended use from the outset of the lease term and not awarding damages because Oak Street "knew that, based upon the expressed nature of . . . [p]laintiff's business, a raw sewage issue was inimical to that enterprise." To prevail on a breach of contract claim, a plaintiff must prove that: (1) the parties entered into a contract; (2) the plaintiff performed as required by the contract; (3) "defendant[s] did not do what the contract required [them] to do," known as a "breach of the contract"; and (4) "defendant[s'] breach, or failure to do what the contract required, caused a loss to" the plaintiff. Globe Motor Co. v. Igdalev, 225 N.J. 469, 482 (2016) (alterations in original) (quoting Model Jury Charges (Civil), 4.10A, "The Contract Claim—Generally" (approved May 1998)). "Each element must be proven by a preponderance of the evidence." Ibid.

The judge found "defendant did provide what was provided by the clear provisions of the lease," and therefore, did not breach the contract for the first

four incidents. We agree. Under the terms of the lease, Onyx had to repair plumbing "used in common by tenants of the [b]uilding." The trial testimony made clear that for each incident, Onyx made necessary repairs and cleaned the affected areas, allowing Pickholz to promptly reopen Kidville after the first four incidents. Similarly, Shavel testified that Neil Diamond remained a tenant for years, despite numerous water issues. Neither Pickholz nor Shavel produced documentation beyond their testimony to support a breach of contract claim. Indeed, as the judge expressed, "we have nothing . . . documenting what happened" until the last flood.

With respect to the first incident, the judge found there were "no damages submitted to us in this court for an albeit small disruption at the outset that apparently did[ not] interfere with [Pickholz's] hard opening of this facility." Regarding the second incident, the judge found "no claims, no insurance claims, [and] not one receipt for one damaged item" on the record to substantiate any damages and further found that "whatever happened[, Onyx] addressed, remediated, and took care of it."

For the third and fourth incidents, the judge found that repairs were completed and any damage promptly cleaned up and remediated. In addition, defendants "had the place tested" for mold and found no "hazardous or

dangerous condition" at the property. The judge concluded there was "no showing whatsoever that any of these problems with plumbing were a breach, or even a material breach," of the lease, which required defendants to maintain the plumbing system "in working order and condition[] . . . throughout the term of the [l]ease."

By promptly addressing the first four flooding incidents and making the necessary repairs, the judge believed defendants fulfilled their obligation under the lease and caused only an "insignificant" disruption to plaintiff. See Berzito v. Gambino, 63 N.J. 460, 469 (1973) ("Not every defect or inconvenience will be deemed to constitute a breach of the covenant of habitability. The condition complained of must be such as truly to render the premises uninhabitable in the eyes of a reasonable person."). Once again, we discern no basis to disturb the judge's findings, which are supported by adequate, credible evidence in the record.

The final issue concerns Oak Street's cross-appeal of the judge's constructive eviction finding. Oak Street argues the judge erred in finding that plaintiff was constructively evicted from the property and dismissing its claims against plaintiff and Pickholz for past-due rent. In support, Oak Street cites Pickholz's admission that Kidville could have reopened after the May 2016 flood

but "indisputably waited seven months to vacate the [p]remises," a length of time Oak Street argues is "unreasonable." (Emphasis omitted.)

Under the rule of constructive eviction, "any act or omission of the landlord . . . which renders the premises substantially unsuitable for the purpose for which they are leased, or which seriously interferes with the beneficial enjoyment of the premises, is a breach of the covenant of quiet enjoyment and constitutes a constructive eviction of the tenant." Reste Realty Corp. v. Cooper, 53 N.J. 444, 457 (1969). "What amounts to a constructive eviction is a question of fact." Gottdiener v. Mailhot, 179 N.J. Super. 286, 293 (App. Div. 1981) (citing Weiss v. I. Zapinsky, Inc., 65 N.J. Super. 351, 357 (App. Div. 1961)).

Upon a constructive eviction, a tenant may be authorized to vacate the premises without further liability to pay rent. Reste Realty, 53 N.J. at 459-60. However, "[a] tenant who continues to occupy the premises for an unreasonable length of time after an act which constitutes constructive eviction[] waives the eviction and may not thereafter abandon the premises and assert eviction." Weiss, 65 N.J. Super. at 357; accord Reste Realty, 53 N.J. at 461 ("The general rule is, of course, that a tenant's right to claim a constructive eviction will be lost if [the tenant] does not vacate the premises within a reasonable time after the right comes into existence."); see also JS Props., L.L.C. v. Brown & Filson,

Inc., 389 N.J. Super. 542, 550-51 (App. Div. 2006) (finding that a six-month occupancy after alleged constructive eviction was an unreasonable delay); Duncan Dev. Co. v. Duncan Hardware, Inc., 34 N.J. Super. 293, 298-99 (App. Div. 1955) (rejecting constructive eviction claim in part because "tenant's continuance in possession operated as a waiver").

The judge found that Oak Street constructively evicted plaintiff, as Kidville could no longer operate on the premises, and "defendant was in breach of an express covenant of implied fitness for its intended use as a childcare facility." Other than commenting that "[i]t was very unclear why . . . plaintiff is purported to have stayed there until December 2016," the judge failed to make any findings regarding the length of time plaintiff remained in possession before vacating the property and whether that length of time was unreasonable.

Pickholz testified that on June 1, 2016, one day after the final flood, Onyx and a Ridgewood health official temporarily ordered him out of the property, but he returned to the upstairs portion a few days later. Pickholz then testified he left for good in early August 2016. In October 2016, plaintiff filed the initial complaint in this matter, while still in possession of the premises. Plaintiff did not surrender the premises until January 1, 2017.

We agree with the judge's finding that a constructive eviction occurred, but we are constrained to remand the matter for the judge to address whether the seven months plaintiff took to surrender the premises was a reasonable length of time. On remand the judge shall address the sole issue of whether seven months was an unreasonable amount of time to vacate the premises after the constructive eviction and, if so, the amount of damages due Oak Street, if any, caused by the delay.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division